## BLUE CROSS OF MASSACHUSETTS, INC., & another *vs.* COMMISSIONER OF INSURANCE.

Suffolk.    November 8, 1985. — March 18, 1986.

Present: HENNESSEY, C.J., ABRAMS, NOLAN, & LYNCH, JJ.

*Commissioner of Insurance. Hospital Service Corporation. Medical Service Corporation. Practice, Civil,* Review of decision of Commissioner of Insurance. *Insurance,* Commissioner of Insurance, Rating. *Administrative Law,* Judicial review, Substantial evidence. *Constitutional Law,* Delegation of powers.

The Commissioner of Insurance acted within his discretion under G. L. c. 176A, § 6, in disapproving a proposed increase in nongroup health insurance rates, since the burden was on the hospital service corporation proposing the rates to demonstrate that the proposed rates were not unreasonable, and the record before the commissioner lacked evidence to support the proponent's potentially self-serving assumption that the factors leading to a decline in total incidence would not have an impact on nongroup incidence as well. [120-123]

There was no merit to the contention of a medical service corporation that the action of the Commissioner of Insurance in disapproving a proposed increase in nongroup health insurance rates was error merely because of the narrow difference between the increase proposed and the increase calculated under the commissioner's methodology, which the corporation did not challenge. [124]

The Commissioner of Insurance properly based his disapproval of proposed increases in nongroup health insurance rates on the ground that the rate filings failed to credit nongroup rates with investment income earned by general reserves of the corporations proposing the rates, even if the existing general reserves were attributable entirely to other lines of business, where it was established by the corporations' filings that nongroup subscribers would be contributing to the maintenance of a future adequate level of general reserves. [125-126]

Language in St. 1984, c. 199, amending G. L. c. 176A, § 6, and c. 176B, § 4, and requiring the Commissioner of Insurance to find, in rate approval proceedings, that the cost containment activities of medical service corporations and hospital service corporations are "acceptable to him," did not, as interpreted by the commissioner, amount to an unconstitutional delegation of discretion to an administrative officer. [127-129]

Prior approval by the Rate Setting Commission under G. L. c. 176A, § 5, of an agreement fixing rates of payment by a hospital service corporation to health service providers does not bar the Commissioner of Insurance, in a proceeding under G. L. c. 176A, § 6, as amended by St. 1984, c. 199, for approval of the rates charged to subscribers, from finding that the corporation's cost containment activities are not acceptable to him. [129-130]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on August 5, 1985.

The case was reported by *Lynch, J.*

*Jeffrey Swope* (*Molly H. Sherden* with him) for the plaintiffs.

· *Stephen S. Ostrach,* Assistant Attorney General (*Cheryl L. Conner,* Assistant Attorney General, with him) for the Commissioner of Insurance.

*Thomas I. Elkind & Robert H. Kelley,* for Massachusetts Association of Older Americans, Inc., amicus curiae, submitted a brief.

LYNCH, J. Blue Cross of Massachusetts, Inc., and Blue Shield of Massachusetts, Inc., seek a review of a decision of the Commissioner of Insurance (commissioner) disapproving filings proposing an increase in nongroup rates. On appeal Blue Cross and Blue Shield argue that the commissioner's decision contains several errors of law and is based upon findings which are unsupported by substantial evidence. We affirm.

On January 2, 1985, Blue Cross and Blue Shield filed proposed revised rates for nongroup subscribers to be effective May 1, 1985, seeking a composite rate increase of 11.5 per cent for Blue Cross and 3.8 per cent for Blue Shield.[1] See G. L. c. 176A, § 6 (1984 ed.); G. L. c. 176B, § 4 (1984 ed.). The Attorney General and the Massachusetts Medical Society (M.M.S.) intervened as parties. The State Rating Bureau (S.R.B.) also participated in the proceedings. The Attorney General, M.M.S., and the S.R.B. all made advisory filings, but only the Attorney General recommended a proposed rate increase (less than that which was sought). On July 25, 1985, the commissioner filed his findings and order disapproving the proposed revision.

---

[1] A subsequent revision reduced the proposed revised rates for Blue Cross to a composite increase of 9.9 per cent.

A single justice of this court allowed a Blue Cross and Blue Shield motion to transfer, consolidate, and fuse a similar action pending in the Superior Court, and reserved and reported the case for decision by the full court.

1. *Standard of review.* In this type of proceeding, the commissioner does not set rates but instead is empowered to review proposed rates. G. L. c. 176A, § 6. G. L. c. 176B, § 4. See *Massachusetts Ass'n of Older Ams.* v. *Commissioner of Ins.,* 393 Mass. 404, 407 (1984). Compare G. L. c. 176A, § 10 (1984 ed.). Contrast G. L. c. 175, § 113B (1984 ed.) (commissioner shall fix and establish automobile insurance rates). No proposed rates can be approved if they are "excessive, inadequate or unfairly discriminatory." G. L. c. 176A, § 6. G. L. c. 176B, § 4. Further, under G. L. c. 176B, § 4, the commissioner may not approve proposed rates if the benefits provided are "unreasonable in relation to the rate charged." The commissioner "may not require that [rates] be at the figures he finds reasonable." *Massachusetts Medical Serv.* v. *Commissioner of Ins.,* 344 Mass. 335, 339 (1962). See *Massachusetts Ass'n of Older Ams.* v. *Commissioner of Ins.,* supra at 407 & n.6. The commissioner must give deference to proposed rates so long as they fall within a range of reasonableness. *Id.* But the burden is on the insurers to furnish evidence which enables the commissioner to establish a range of reasonableness, *Massachusetts Ass'n of Older Ams., supra* at 407-408, *Liberty Mut. Ins. Co.* v. *Commissioner of Ins.,* 366 Mass. 35, 42 (1974), and "[t]he statute does not require the commissioner to approve elements of filings which would lead to rates falling within a range of excess, no matter how small." *Workers' Compensation Rating & Inspection Bureau* v. *Commissioner of Ins.,* 391 Mass. 238, 264 (1984).

Our review must accord "the deference due the commissioner's specialized knowledge, technical competence, and experience, regarding issues within the scope of his statutorily delegated authority." *Workers' Compensation Rating & Inspection Bureau, supra* at 246. See *Massachusetts Ass'n of Older Ams., supra* at 414.

Our review of the rates is governed by both G. L. c. 176A and G. L. c. 176B, §§ 12, 17 (1984 ed.). Review under G. L. c. 176A, § 6, is governed by G. L. c. 30A, § 14 (7) (1984 ed.). *Massachusetts Ass'n of Older Ams., supra* at 408 & n.9. Thus we shall not disturb the commissioner's decision unless it is based upon an error of law, unsupported by substantial evidence, arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. G. L. c. 30A, § 14 (7) (*c*), (*e*) and (*g*) (1984 ed.).

Review pursuant to G. L. c. 176B, § 12, is limited to whether there is reasonable support in the evidence for the commissioner's findings. The standard of review to be applied to such a determination is the same under G. L. c. 176B, § 12, as under G. L. c. 176A, § 6. *Massachusetts Ass'n of Older Ams., supra* at 409. It is axiomatic that we retain the power to review the commissioner's decision for errors of law and to insure that his decision is in accordance with law under G. L. c. 176B, § 12.[2]

2. *Substantial evidence.* Blue Cross argues that the commissioner's disapproval was not based on substantial evidence to the extent he found "unsupported inconsistencies" in the Blue Cross filing. The thrust of the argument is that the commissioner relied on the testimony of a witness, nonexpert in the particular area in question, to disapprove the filing. Blue Cross argues that this violates the substantial evidence test because it was "contrary to the recommendations of all experts who testified at the hearing." *Medical Malpractice Joint Underwriting Ass'n v. Commissioner of Ins.,* 395 Mass. 43, 55 (1985), quoting *Massachusetts Auto. Rating & Accident Prevention Bureau v. Commissioner of Ins.,* 362 Mass. 43, 46 (1972). A review of the facts underlying the issue demonstrates the fundamental error in this position.

---

[2] We again reserve decision on whether G. L. c. 30A applies to proceedings under G. L. 176B, § 4. See *Massachusetts Ass'n of Older Ams. v. Commissioner of Ins.,* 393 Mass. 404, 409 n.10 (1984). However, the standards of G. L. c. 30A do apply for judicial review under G. L. c. 176A, § 6. Although G. L. c. 176B, § 12, may or may not impose broader standards of review we hold that for purposes of this case it does not.

To determine the anticipated cost of inpatient hospital services to nongroup subscribers, the projected number of days they will be in the hospital[3] must be multiplied by the average cost per hospital day.[4] In determining average cost per day, a factor is used known as "total or overall incidence." It was assumed by all parties that, during the period in question, there would be a decline in both over-all and nongroup incidence rates. To the extent that the decline in over-all incidence exceeds the decline in nongroup incidence, the nongroup premium should be higher because that group would be using a greater proportion of inpatient hospital services.

Blue Cross originally projected a decrease in nongroup incidence for 1985 and 1986, compounded, between 5.9 per cent and 8.0 per cent. It projected decline in total incidence for the same period compounded to 6.4 per cent. Thus, Blue Cross based its original filing on the factual assumption that nongroup incidence could decline faster than total incidence. After an employee of the Rate Setting Commission (R.S.C.) testified, a Blue Cross actuary revised the estimate for total incidence compounded to 10.7 per cent. Blue Cross did not adjust the estimates for nongroup incidence, however. The R.S.C. employee testified that reliance on the original estimate for nongroup incidence was "inherently wrong" and went on to testify that there was no evidence to justify revision of the total incidence without revising nongroup incidence as well.

The commissioner noted the "selective revisions" made to the original projection, and pointed out that the revised estimate increased the Blue Cross nongroup rate but did not provide any "evidence to support [the] reversal in its [initial] assumption about the relative magnitude of rates of decline in total hospital days and nongroup incidence." As he pointed out, Blue Cross "went from assuming that the decline in nongroup incidence

---

[3] To arrive at a figure which represents cost per patient, namely, one which can translate into an individual rate, nongroup incidence is calculated on the basis of incidence per 100 contracts.

[4] General Laws c. 6A, § 53 (1984 ed.), requires hospital charges to be uniform for all patients. Thus, there is no need to calculate average cost per day for nongroup subscribers separately.

would almost equal or exceed the reduction in total hospital days to assuming that nongroup incidence would decline much more slowly than total hospital days." The commissioner specifically held that the burden was on Blue Cross to provide adequate evidence to enable him to make a determination of reasonableness, and that on the basis of the record before him[5] the "unsupported inconsistencies between the projected rates of decline in nongroup incidence and total hospital days" were unreasonable.

Blue Cross's reliance on *Medical Malpractice Joint Underwriting Ass'n, supra,* is misplaced. In that case we rejected rates fixed by the commissioner because the necessary substantial evidence test was not met, although we were critical of the commissioner's decision to combine "different rate components proposed by various expert witnesses to arrive at a lower insurance rate than any of these experts proposed." *Id.* at 55. We held that that method of computation was not "by itself sufficient proof that his decision was not based on substantial evidence in the record." *Id.* at 56. The statutes circumscribing the commissioner's discretion in that case required the rates fixed by the commissioner to be "actuarially sound" and "self-supporting." *Id.* at 57. See St. 1975, c. 362, § 6. Thus, we required only that if the commissioner sets rates below a level suggested by every actuarial expert, he "must clearly demonstrate that each selected rate component is truly independent and is supported by substantial evidence." *Id.* at 57. What was lacking there was "greater specificity in [the] administrative findings and conclusions." *Id.* Thus, we did not categorically rule out the possibility that the commissioner could set rates which no actuarial expert supported.

Essentially, Blue Cross would have us hold that if it can marshal its experts unanimously to one position, and if no expert testifies to the contrary, then the commissioner must err for lack of substantial evidence if he finds against the consensus of the experts. That position is untenable. Since the burden is on Blue Cross to provide the commissioner with

---

[5] The commissioner did not rely specifically on the testimony of the R.S.C. employee, but rather "on the record before him."

sufficient evidence to demonstrate that the proposed rates are not unreasonable, the commissioner is within his discretion to reject proposed rates which lack such support. In such a case, expert testimony supporting the commissioner's view is not a prerequisite as long as his determination that the proponent has failed to sustain its burden of proof is supported in the record.[6] Here, the commissioner was fully justified in disapproving the Blue Cross filing. While there may be numerous reasons why nongroup and total incidence may not be directly related, Blue Cross offered no evidence to support its assumption that the factors that lead to a decline in total incidence did not have an impact upon nongroup incidence as well. Since that assumption was potentially self-serving,[7] the commissioner was justified in disapproving the proposed rates because the inconsistency was not explained adequately in the record.[8]

---

[6] Thus, it is immaterial whether the R.S.C. witness was an expert for purposes of testifying as to the inconsistencies in the Blue Cross filing. The commissioner's decision was neither required to be, nor was it in fact, premised exclusively upon that testimony. See note 5, *supra*.

[7] If total incidence declines faster than nongroup incidence, nongroup rates will be higher than if total incidence and nongroup incidence decline at the same rate, or if nongroup incidence declines faster than total incidence.

[8] Since Blue Cross misconstrued our decision in *Medical Malpractice Joint Underwriting Ass'n* v. *Commissioner of Ins.*, 395 Mass. 43 (1985), it failed to adequately address the scope of review issue in this case. While we hold that the commissioner appropriately disapproved the Blue Cross filing for failure to meet its burden of proof, we do not expressly rely on either the "substantial evidence" or the "arbitrary or capricious" standard exclusively. Although an incomplete, inconsistent, or otherwise inadequate rate proposal is itself substantial evidence or the basis for substantial evidence for a disapproval — since the commissioner can infer what is lacking from what is in evidence — this would often have the absurd consequence that substantial evidence for a commissioner's decision would be the fact, inferable from the evidence, that there was not enough evidence, or that the evidence is inconsistent. It may be the case, though we do not reach this issue, that such decisions by the commissioner in rate approval cases are best tested under the "[a]rbitrary or capricious, abuse of discretion, or otherwise not in accordance with law" standard. A decision to disapprove proposed rates for failure to meet the burden of proof is less an evidence issue than an issue of applying a standard of law to test the sufficiency of proof. It may be preferable to understand our review in such cases as one testing whether the commissioner has arbitrarily or capriciously overlooked

3. *Range of reasonableness*. Blue Shield proposed a rate increase of 3.3 per cent to meet anticipated cost. The commissioner disapproved that amount in part on the basis of S.R.B. projection of costs which it is contended would lead to a 2.0 per cent increase. Blue Shield does not challenge the commissioner's judgment in preferring the S.R.B. methodology over that proposed by Blue Shield, nor does it contend that this aspect of the decision lacks reasonable support in the evidence. Instead, Blue Shield argues that the disapproval, based on a 1.3 per cent differential, was an error of law because "[a] mere 1.3 per cent difference must lie within the range of reasonableness." That argument is patently inconsistent with the holding in *Workers' Compensation Rating & Inspection Bureau* v. *Commissioner of Ins.*, 391 Mass. 238 (1984). In that case a similar argument was made and rejected. There, the commissioner found that a particular method of calculating an element of proposed rates would lead to excessive rates. *Id.* at 262. The argument of error was predicated on the fact that the rate levels would only increase .1% under the rejected methodology. *Id.* at 263. In disagreeing with that assertion of error we held: "[the] commissioner [is not required] *to approve elements of filings which would lead to rates falling within a range of excess, no matter how small.*[9] The commissioner's decision disapproving rates needs only to be reasonably supported by the evidence that the proposed filing will fail to produce rates which are not excessive, or will result in inadequate or unfairly discriminatory rates." *Id.* at 264 (emphasis added). Since there is no challenge of the commissioner's choice of methodologies, that holding is dispositive in this case.

elements of a proposed filing, or arbitrarily or capriciously incorporated unsupported factual assumptions in his decision, or whether he has abused his discretion by setting a standard for burden of proof which is not in accordance with law.

[9] In its reply brief, Blue Shield argues that *Workers' Compensation Rating & Inspection Bureau* v. *Commissioner of Ins.*, 391 Mass. 238 (1984), should be distinguished on the ground that that case applies the range of reasonableness test to elements of filings, not over-all rates. It is obvious, however, from the underscored language that we did, and do, intend our holding to apply to over-all rates.

4. *General reserves*. The commissioner disapproved the rate filings of Blue Cross and Blue Shield on the further ground that those filings failed to credit nongroup rates with investment income earned from general reserves. Blue Cross and Blue Shield argue that the commissioner was in error because the general reserves are entirely attributable to other lines of business and that therefore, under the commissioner's approach, other lines of business are effectively subsidizing nongroup rates, contrary to our holdings in *Insurance Rating Bd.* v. *Commissioner of Ins.*, 359 Mass. 111, 116 (1971). *Aetna Casualty & Sur. Co.* v. *Commissioner of Ins.*, 358 Mass. 272, 279-280 (1970).

In both *Insurance Rating Bd., supra,* and *Aetna Casualty & Sur. Co., supra,* we held that "[u]nder the statutes each type of automobile insurance coverage must be considered and treated separately from all others." *Insurance Rating Bd., supra* at 116. See *Aetna Casualty & Sur. Co., supra* at 280. We specifically applied this principle to investment income. *Insurance Rating Bd., supra.* Assuming, without deciding, that similar statutory construction is warranted in this context, we. nevertheless conclude that the commissioner's disapproval of Blue Cross's and Blue Shield's proposed rates was not an error of law.

Blue Cross and Blue Shield sought "to follow their usual practice of crediting to nongroup subscribers the investment income earned from nongroup premium and claims reserves." Also in accordance with prior practice, they did not credit nongroup subscribers with investment income from general reserves (by agreement with group subscribers those subscribers do not receive a general reserve investment credit either). In requiring Blue Cross and Blue Shield to alter their prior practice, the commissioner found that nongroup subscribers are entitled "to be[ ] credited . . . with *their share* of total investment income" (emphasis added). Blue Cross and Blue Shield base their argument of unlawful subsidization on the fact that in 1975 their general reserves were exhausted and that since 1975 nongroup lines have recorded a net operating loss. From this they conclude that none of the general reserves

are attributable to nongroup subscribers. The commissioner noted that this conclusion was disputed, but he was willing to assume for purposes of his decision that nongroup business operated at a loss which led, in effect, to a subsidy by the group lines.

The commissioner's decision was nonetheless correct, and not inconsistent with the principles enunciated in *Insurance Rating Bd., supra,* and *Aetna Casualty & Sur. Co., supra.* In his order, the commissioner affirmed "the obligation of non-group subscribers to contribute their share to maintain a reasonable level of [Blue Cross/Blue Shield] reserves . . . ." In fact, the Blue Cross and Blue Shield filings included a charge for reserve contributions. If nongroup members pay their fair share of reserve contributions then they may be credited with investment income from general reserves.[10] Such a scheme fully comports with, and is consistent with our prior decisions. The fact that nongroup lines have operated at a loss is beside the point. The cost of general reserves reflects cost of what *will be needed* to maintain an adequate level of general reserves. In short, that cost is a cost which is prospective in nature. As with all such prospective calculations, some variance from actuarial predictions must be expected. If it turns out that over a given period of time general reserves are disproportionately drawn by one line or another, that in itself cannot justify diminishing that line's share of investment return.[11] Once a particular line has borne the fair share of the cost of maintaining an adequate reserve level, it may receive credit for investment income. Even assuming that reserve levels were inadequate in the past, the commissioner approves rates prospectively, not retrospectively. See *Newton* v. *Department of Pub. Utils.,* 367 Mass. 667, 678-680 (1975). Cf. *Attorney Gen.* v. *Commissioner of Ins.,* 370 Mass. 791, 823-824 (1976). The only question is whether the contribution will lead to a fair division of responsibility for creating adequate reserves for the future. The

[10] No one questions, and we do not pass upon, the propriety of a scheme of general reserves under the applicable statutes.

[11] Of course, rates which systematically subsidize one line of insurance at the expense of another, by definition, do not fairly distribute the cost of maintaining adequate reserve. No such challenge is present here.

argument that a credit for investment should be denied would thus be an argument for recoupment of past losses, which we have rejected, in the absence of specific statutory authority. See *Newton* v. *Department of Pub. Utils., supra* at 679-680.

5. *St. 1984, c. 199.* Blue Cross and Blue Shield challenge the commissioner's finding that neither Blue Cross nor Blue Shield had shown that their cost control programs would have a "demonstrated impact" on the prevention of reimbursement for medically unnecessary services.[12] They claim that the commissioner acted in excess of his statutory authority and committed errors of law. It should be noted that they do not contend that the factual predicate to this finding is that Blue Cross's record in cost control was abysmal and Blue Shield's only slightly better was not supported by the record. In particular they claim that the commissioner's reading of the "acceptable to him" standard creates an unconstitutional grant of unfettered discretion and that he erred in asserting his jurisdiction over contracts which are also within the purview of R.S.C.'s responsibility to approve under G. L. c. 176A, § 5 (1984 ed.).

In his decision, the commissioner noted that c. 199 requires that cost containment activities must be "acceptable to him." St. 1984, c. 199. He enunciated the meaning of that phrase: "The standard of acceptability requires that I judge the soundness, scope and adequacy of [Blue Cross/Blue Shield] utilization review and cost containment activities." In passing on the "specific techniques" used, he looked at "both the extent of reimbursement of unnecessary services and the range of available utilization review and cost containment techniques." He further stated, "The scope and results of [Blue Cross/Blue Shield] programs must be measured against the opportunities which exist for improvement."

---

[12] Statute 1984, c. 199, § 2 and §§ 5 and 6, amended G. L. c. 176A, § 6, and G. L. c. 176B, § 4, respectively, to require the commissioner to make a finding in rate approval hearings that Blue Cross and Blue Shield "employ[] a utilization review program and other techniques acceptable to him which have had or are expected to have a demonstrated impact on the prevention of reimbursement by such corporation[s] for services which are not medically necessary."

We have repeatedly held that broad delegations of authority do not violate art. 10 or art. 30 of the Declaration of Rights to the Constitution of the Commonwealth, or Part II, c. 1, § 1, art. 4, of the Constitution of the Commonwealth when "clear legislative standards [are] provided to guide the officer in exercising the delegated authority in accordance with the legislative policy." *Opinion of the Justices,* 393 Mass. 1209, 1220 (1984). See *Arno* v. *Alcoholic Beverages Control Comm'n,* 377 Mass. 83, 85 (1979); *Arlington* v. *Board of Conciliation & Arbitration,* 370 Mass. 769, 775-776 (1976). However, we do not insist upon "[a] detailed specification of standards," *Massachusetts Bay Transp. Auth.* v. *Boston Safe Deposit & Trust Co.,* 348 Mass. 538, 544 (1965), and have allowed "the Legislature [to] delegate to a board or an individual officer the working out of the details of a policy adopted by the Legislature." *Commonwealth* v. *Hudson,* 315 Mass. 335, 341 (1943). See *Corning Glass Works* v. *Ann & Hope, Inc.,* 363 Mass. 409, 421-422 (1973), and cases cited. Even "very general [legislative] guides" are sufficient if appropriate judicial review procedures are provided for. *Id.* at 422.

Here, the commissioner's own interpretation of the statute makes clear that he does not have unfettered discretion and that no improper delegation has been made. First, the discretion granted by the phrase "acceptable to him" is strictly limited to review of utilization review programs and techniques. Second, as the commissioner correctly perceived in his analysis of the standards he would employ under that phrase, the phrase "acceptable to him" is importantly modified by the standard of "demonstrated impact." In enunciating the various standards he would use for review under the "acceptable to him" phrase, the commissioner clearly construed his authority in light of the general, but clear, "demonstrated impact" standard. In enacting St. 1984, c. 199, the Legislature appropriately delegated the power to explicate the details of the "demonstrated impact" standard to the commissioner: the commissioner recognized this and did not exceed the bounds of that delegation.[13] In fact,

---

[13] No issue is raised in this case regarding the proper exercise of the delegated authority via rule making or adjudication.

the commissioner restricted his discretion in holding that "[i]t is beyond the scope of my statutory authority to dictate exactly what utilization review and cost containment programs should be undertaken . . . ." Instead, he listed options which Blue Cross and Blue Shield should consider.

Blue Cross next argues that the commissioner cannot reject utilization review provisions which are part of the agreement which it negotiated with hospitals. Were this contention to succeed, the commissioner would be obliged to approve whatever cost containment methods Blue Cross, Blue Shield and the hospitals agree upon. Such an interpretation does not pass careful scrutiny. The hospital agreement was reviewed and approved by the R.S.C., which has express statutory authority to approve "any rate of payment . . . if such rate, in the opinion of the commission, contains an incentive to achieve greater efficiency and economy in the manner of providing health care services without adversely affecting the quality of such services." G. L. c. 176A, § 5 (1984 ed.).[14] Blue Cross asserts that prior approval of a contract by the R.S.C. bars the commissioner from finding that the St. 1984, c. 199, requirements have not been met.

Blue Cross utterly misconceives the statutory harmony which exists between G. L. c. 176A, § 5, and G. L. c. 176A, § 6. Under G. L. c. 176A, § 6, the commissioner approves and disapproves rates charged to subscribers and must make the appropriate findings under St. 1984, c. 199. Under G. L. c. 176A, § 5, the R.S.C. approves or disapproves rates of payment to providers as set out in contracts authorized by that section: rates of payment which provide incentives for greater efficiency and economy which do not adversely affect the quality of services *may* be approved. The R.S.C. is nowhere authorized to approve rates *for subscribers,* which is the commissioner's prerogative, and thus is not empowered to make a finding pursuant to St. 1984, c. 199. Moreover, the R.S.C. does not have to make an efficiency and economy finding vis-à-vis contracts with providers at all — it is merely authorized

[14] The record does not reflect whether or not a specific finding was made by the R.S.C. under this segment of § 5. Thus no issue of collateral estoppel has been raised.

to do so. Finally, by their very terms the standards are different standards. It is ludicrous to believe that the Legislature intended that even an affirmative R.S.C. finding that rates charged to providers contain incentives for economy and efficiency within the meaning of G. L. c. 176A, § 5, would bar the commissioner from making an adverse finding against Blue Cross that it failed to meet the St. 1984, c. 199, burden vis-à-vis subscriber's rates. The potential for being "whipsawed"[15] between the agencies is completely within the hands of Blue Cross. Blue Cross cannot complain when it enters contracts with providers based in part on prior rates approved for subscribers and *then* seeks, unsuccessfully, to garner rate increase approval from the commissioner. The force of the plaintiffs' arguments in this regard is also seriously eroded by their concession that only *some* of the cost containment measures suggested by the commissioner are precluded by the agreement in its present form.

Since the commissioner's disapproval was based on substantial evidence, was not arbitrary or capricious, and was not in excess of statutory authority, or based on errors of law, a judgment is to enter in the Supreme Judicial Court for the county of Suffolk affirming his decision.

*So ordered.*

---

[15] That assumes, of course, that even in this scenario Blue Cross is truly whipsawed. There is no need to discuss, in the context of this case, the differences between G. L. c. 176A, §§ 5 and 6, that might make an affirmative positive finding under § 5 and an affirmative adverse finding under § 6 consistent.