NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 111

No. 2016-044

In re MVP Health Insurance Company

Supreme Court

On Appeal from
Green Mountain Care Board

June Term, 2016

Alfred Gobeille, Chair

Gary F. Karnedy and Kevin M. Henry of Primmer Piper Eggleston & Cramer PC, Burlington, for Appellant.

William H. Sorrell, Attorney General, Bridget Asay, Solicitor General, and Elizabeth M. Tisher, Assistant Attorney General, Montpelier, for Appellee Green Mountain Care Board.

Lila Richardson and Kaili Kuiper, Vermont Legal Aid, Inc., Montpelier, for Appellee Office of the Health Care Advocate.

PRESENT: Reiber, C.J., Dooley, Skoglund and Eaton, JJ., and Teachout, Supr. J., Specially Assigned

¶ 1. **DOOLEY, J.** This case arises out of the rate filing submitted to the Green Mountain Care Board (GMCB) by MVP Health Insurance Company (MVP) with respect to the Agri-Services health insurance plan. Acting through its authority to review and approve or deny health insurance rates in the State of Vermont, GMCB found that the 2015 Agri-Services rate filing would not promote access to quality health care and denied it on that basis. MVP appeals, arguing that GMCB's disapproval was an arbitrary use of discretion based on vague standards that unconstitutionally delegated authority to GMCB, that GMCB's decision is not supported by the

record, and that GMCB's statutory interpretation of its authority is compelling error. We hold that 8 V.S.A. § 4062 is constitutional but find that GMCB's conclusions were not supported by specific findings on the statutory criteria required for approval of health insurance rates and, accordingly, reverse and remand for new findings consistent with this opinion.

¶ 2. Agri-Services is an association for farmers that provides a health insurance plan to its members. This plan is provided through MVP, a New York corporation that provides health insurance in Vermont and New York. Agri-Services has a minimum premium plan, under which Agri-Services pays its own claims up to 115% of expected claim liability, and MVP provides administrative services and stop-loss coverage at a pooling level of $200,000. At the time of GMCB's review, Agri-Services offered five health plans that covered 1220 of its members for one full year beginning December 2015.

¶ 3. As per 8 V.S.A. § 4062(a)(1), an insurer may not deliver or issue for delivery a health insurance policy in Vermont until a copy of the policy's premium rates is filed with GMCB and GMCB has issued a decision approving, modifying, or disapproving the proposed rate. GMCB "shall determine whether a rate is affordable, promotes quality care, promotes access to health care, protects insurer solvency, and is not unjust, unfair, inequitable, misleading or contrary to the laws of this State." Id. § 4062(a)(3). In rendering its decision, GMCB "shall consider the analysis and opinion provided by the Department of Financial Regulation" regarding the impact of the proposed rate on the insurer's solvency and reserves. Id. § 4062(a)(2)-(3).

¶ 4. In July 2014, MVP submitted its 2014 Agri-Services filing, allowing GMCB to conclude its ninety-day review, and the carrier to provide at least thirty days' notice to affected members of an approved rate change prior to its December 1 effective date. At the time of its 2014 rate filing, Agri-Services advised GMCB that it would discontinue its policies in Vermont and that its members would purchase future coverage through Vermont Health Connect. GMCB maintains that it premised its approval of Agri-Services' 2014 rate filing, including an increase of 14.9%, on

MVP's confirmation that the filing would be its last and that members would be notified that they would need to enroll in a plan through Vermont Health Connect for 2015.

¶ 5.　　In 2015, MVP did not submit its Agri-Services Association Rate Filing to GMCB until September 9. In its filing, MVP requested a 26.9% average annual rate increase. GMCB submitted the filing to its actuaries, who reviewed it. On October 30, 2015, Agri-Services notified its members of the rate increase, stating that the increase was "pending approval." Agri-Services told members that those who did not terminate coverage would be billed at the preexisting premium rate until new rates were determined, and that they would be retroactively billed at the new premium rates once they were finalized. Subsequently, Agri-Services advised members that they could terminate their coverage and enroll in Vermont Health Connect, but must do so no later than December 15, 2015, for coverage beginning on January 1, 2016.

¶ 6.　　During the course of actuarial review, an error was discovered in MVP's rate calculation, and MVP submitted a revised filing on November 3, 2015, requesting an average annual rate increase of 27.4%. MVP used claims made from May 1, 2014, through April 30, 2015, and paid through June 30, 2015, to develop its proposed rates. MVP projected the base period claims, minus claims in excess of $200,000, forward to the ratings period using an annual effective medical cost increase trend of 6.6% and prescription drug cost increase trend of 17.5%, and then adjusted the projected claims to account for a 2.7% stop-loss fee. No adjustment was made for demographic changes and premium cost was increased to account for operating expenses of 15.9%, including general administrative expenses of 9.75% and a 1% contribution to surplus. GMCB found that the proposed rate increase of 27.4% resulted from observed claim trends that had "far outpaced premium increases," with observed cost increase trends of 30.4% for medical and 55.8% for prescription drug costs for a total cost increase of 32.6%. After reviewing the rate filing, GMCB's actuaries recommended that GMCB calculate a single conversion factor and demographic factor based on Agri-Services' most recent enrollment distribution, which would

3

reduce the rates by approximately 0.9%, and use Agri-Services' specific experience to calculate its projected medical and prescription drug trends, reducing the medical cost increase trend from 6.6% to 6.4% and the pharmacy cost increase trend from 17.5% to 17.1%. These two adjustments would decrease the rate increase to 25.9%. While the actuaries noted that some members would experience "undoubtedly a significant increase" if the filing was approved, they concluded that the proposed rates were not excessive, inadequate, or unfairly discriminatory. The Office of the Health Care Advocate (HCA), on the other hand, recommended that GMCB disapprove or modify the rate request to make it "as affordable as possible." MVP requested that GMCB reject the actuaries' recommendations and approve the rates as originally filed.

¶ 7. The parties waived a hearing pursuant to GMCB Rule 2.000 and filed memoranda arguing their position in lieu of a hearing. In considering the parties' requests, GMCB noted that the rate increases proposed by MVP were higher than any previously approved by the Board. Furthermore, GMCB noted that it had premised its approval of Agri-Services' 14.9% rate increase in 2014 on MVP's confirmation that the 2014 rate filing would be Agri-Services' last. GMCB criticized the tardiness of MVP's filing, noting that by filing as late as September 9 it left the Board insufficient time to complete its ninety-day review before a December 1 effective date, making it impossible for Agri-Services to comply with GMCB Rule § 2.2405 and notify its members of the rate increase thirty days or more prior to the increase taking effect. MVP's error in filing further compounded the problem by delaying review even more, meaning that GMCB's review could not commence until after its revised filing was submitted in November. Furthermore, GMCB found that MVP improperly characterized the Agri-Services plans as "transitional," a designation which no longer exists in the State of Vermont. GMCB noted that no evidence in the record suggested that Agri-Services had ever notified its members that their plans would no longer be renewed, as they had represented would happen in their 2014 rate filing. Taken together, GMCB found that the tardiness of the filing, and the confusion over whether or not the previous year's filing would

4

be the last for this plan, demonstrated a "lack of accountability," leading GMCB to conclude that the proposed rates "did not promote access to quality health care and are unfair, unjust and inequitable."

¶ 8. MVP filed a motion for reconsideration on January 11, 2016, which GMCB denied on January 21. MVP appealed.

¶ 9. On appeal, MVP makes the following alternative arguments: (1) GMCB's disapproval constituted an arbitrary exercise of discretion based on vague statutory standards that unconstitutionally delegated legislative authority to GMCB; (2) GMCB improperly disapproved the rate filing on grounds not supported by the record; and (3) GMCB's decision is based on an erroneous interpretation of its statutory grant of authority. We conclude that 8 V.S.A. § 4062 is constitutional but agree that GMCB's conclusions were not supported by specific findings on the statutory criteria required for approval of health insurance rates and reverse and remand for new findings on that ground. Accordingly, we need not address MVP's final argument.

¶ 10. The first issue is a question of constitutional law, which we review de novo.[1] Badgley v. Walton, 2010 VT 68, ¶ 4, 188 Vt. 367, 10 A.3d 469. "Where warranted by the

---

[1] We acknowledge that, as per the doctrine of constitutional avoidance, "[s]tatutory claims are to be considered first, and if dispositive, we will not need to reach the constitutional issues." State v. Curtis, 157 Vt. 275, 277, 597 A.2d 770, 772 (1991). However, in this instance "disposition of the case requires" consideration of the constitutional question, as MVP is requesting different remedies, one bearing on the jurisdiction of GMCB and one bearing on the decision and order in this case. Id. First, MVP asks that we declare 8 V.S.A. § 4062(a)(3) and 18 V.S.A. § 9375(B)(6) unconstitutional and, accordingly, hold that GMCB lacked the authority to regulate rates in any case. In the alternative, MVP requests that we reverse GMCB's decision on the rates it submitted for approval because the Board did not set forth sufficient specific findings and the decision was not based on the statutory criteria. To that end, addressing the second question would not determine whether the GMCB can regulate rates, the primary issue MVP presents. Thus, it would not fully resolve the case and we must address the delegation question. Compare Veasey v. Abbott, No. 14-41127, 2016 WL 3923868, at *33, __ F.3d__, (5th Cir. 2016) (concluding that because court found voter ID law has discriminatory effect under Voting Rights Act, "[p]laintiffs will be entitled to the same relief they could access if they prevailed on [their] First and Fourteenth Amendment claims" and as "the rights and remedies are intertwined," court need not decide constitutional question), and Ketchum v. Byrne, 740 F.2d 1398, 1409-10 (7th Cir. 1984) ("There appears to be no difference in the practical result or in the available remedy regardless of how the

evidence, an administrative board's findings of fact are conclusively binding on this Court." In re Agency of Admin., State Bldgs. Div., 141 Vt. 68, 74, 444 A.2d 1349, 1351 (1982).

¶ 11. MVP's first contention is that 8 V.S.A. § 4062 fails to provide appropriate delegation boundaries to GMCB in violation of the Vermont and United States Constitutions.[2] Specifically, MVP argues that the Legislature failed to provide "sufficient, concrete guidance" as to the meaning of the terms "affordable," "promotes quality care," and "promotes access to health care," or direction as to what evidence GMCB should consider when making these statutory determinations. MVP imagines at least four possible definitions for the promotion of quality care and access to healthcare—ranging from charging high premiums to attract skilled healthcare workers to Vermont to capping premiums for all patients—to suggest that the question of what constitutes quality care or access is a "public policy argument[]" that should have been decided by the Legislature, rather than delegated to GMCB. We disagree.

¶ 12. We begin by noting that in modern case law we have found that duly enacted laws represent an improper delegation of the Legislature's law-making function only if they are devoid of any conceivable standard to guide and constrain discretion. For example, in Hunter v. State, this Court considered whether the Legislature validly delegated the authority to prepare and implement a deficit-prevention plan to address a revenue shortfall while it was not in session to the Secretary of Administration, an executive branch official, and to the Joint Fiscal Committee (JFC), a legislative committee. 2004 VT 108, ¶ 1, 177 Vt. 339, 865 A.2d 381. In relevant part,

---

resulting discrimination is characterized. We therefore shall not explicitly decide the issue of a fourteenth amendment violation . . ."), with In re Sealed Documents, 172 Vt. 152, 156, 772 A.2d 518, 523 (2001) (observing we address constitutional issues "when the matter is squarely and necessarily presented"). See also Brigham v. State, 2005 VT 105, ¶ 10, 179 Vt. 525, 889 A.2d 715 (mem.) ("The doctrine of judicial restraint does not allow the court to relinquish its duty to interpret the constitution when judicial intervention may potentially block legislative action.").

[2] GMCB has drawn no distinction between the federal and state constitutions with respect to this claim. We thus have considered precedents under both as well as precedents from other states.

6

the plaintiffs argued that even an otherwise valid legislative delegation "cannot be made without limiting standards for the exercise of discretion" and that no standards existed where the Secretary's authority to implement a deficit-reduction plan contained only the following limits:

> (1) the official revenue estimate for the general, transportation or federal fund must have declined by 2% or more from that in effect on January 15, 2002; (2) the Legislature must not be in session; (3) the plan must be necessary to ensure a balanced budget in the general or transportation funds; (4) the plan must be designed to minimize any negative effects on the delivery of services and on local budgets . . . ; and (5) the plan must reflect the priorities established by the general assembly in the fiscal year 2003 appropriations act.

Id. ¶ 26 (quotations omitted). We found that the above limits provided the needed standards.

¶ 13. In reaching our conclusion, we observed that the principal difference between schemes that have been upheld and those that have been struck down is whether there are "any standards" for the exercise of discretion. Id. ¶ 28. We surveyed a series of cases from our sister states, contrasting those where delegations were invalidated because the Legislature had "articulated no principles, intelligible or otherwise, to guide the executive," id. (quoting State v. Fairbanks N. Star Borough, 736 P.2d 1140, 1143 (Alaska 1987)), with those where delegations were upheld because they permitted actions only, for example, "to the extent that [the executive] deems necessary" and as such were deemed sufficient because "they were as definite as was reasonably practicable under the circumstances." Id. ¶ 30 (citing Univ. of Conn. Ch. AAUP v. Governor, 512 A.2d 152, 158-59 (Conn. 1986)). Accordingly, mindful of the fact that we "begin with an assumption that the legislation is constitutional," we held that the standards imposed were sufficient for the exercise of the Secretary's and JFC's powers, as they were tailored to the circumstances; in particular, we noted it "would be difficult here to create more detailed, narrow or explicit standards" and observed "flexibility is required" to implement reductions in a way that minimizes public harm. Id. ¶ 31. Compare Vincent v. Vt. State Ret. Bd., 148 Vt. 531, 535-36, 536 A.2d 925, 928 (1987) (noting that because Legislature used clear language in determining

when Retirement Board should offset compensation award against pension, fact they were granted "discretionary authority" in determining <u>how</u> to offset award is immaterial, as Legislature provided "clear mandatory guidelines" to follow in arriving at decisions), and <u>Vt. Educ. Bldgs. Fin. Agency v. Mann</u>, 127 Vt. 262, 268, 247 A.2d 68, 72 (1968) (concluding agency's delegated authority to enter contracts to achieve valid public objective was "neither new nor untried," such authority necessarily "involves a wide discretion on the part of the Agency," and is legitimate because delegation confines authority "within ascertainable and reasonable boundaries"), with <u>In re Handy</u>, 171 Vt. 336, 348-49, 764 A.2d 1226, 1238 (2000) (recognizing that although "a standard sufficient to save [a] statute can be general, and can be derived from historical usage or other parts of the statutory scheme," statute involved in this case "provides absolutely no standard or guidance" and "on its face . . . provides unlimited discretion for a selectboard to grant or deny permission," has "no historical usage," and bears only "general and inclusive policy statements that do not held provide limits for administration" (citations omitted)), and <u>Vill. of Waterbury v. Melendy</u>, 109 Vt. 441, 453, 199 A. 236, 242 (1938) (finding law did not meet constitutional requirements where Legislature did not indicate any policy or plan for apportionment of expense of projects, did not state directly or by implication nature or kind of benefits to which it referred and gave "no rule or standard by which those benefits [were] to be determined and the assessments made," such that "[t]he commission, in order to act, must say what the law shall be and not merely exercise discretion as to its execution").

¶ 14.    Indeed, when our sister states have wrangled with comparable cases, they have reached identical conclusions.  For example, in <u>Beverly Enterprises-Florida v. McVey</u>, a Florida appellate court considered whether a statute governing nursing home residents' rights was an unconstitutional delegation of legislative authority where the statute instructed the Agency for Health Care Administration that patients had the "right to receive adequate and appropriate health care," a right which the plaintiff argued was not defined by any "discernible standard."  739 So.2d

8

646, 648 (Fla. Ct. App. 1999). The Florida court found that the statute was not an unlawful delegation of legislative authority, observing:

> The specificity of the standards and guidelines the legislature provides may depend upon the subject matter at issue and the degree of difficulty involved in articulating finite standards. It is this principle which we deem controlling as to [the statute]. The term healthcare is one which can be easily determined in the community. What is adequate and appropriate healthcare will change from day to day based on advancements in medicine and technology. It is not possible for the legislature to anticipate what is now unknown and untested and include it in a finite definition. It is only by placing the authority in the agency to make this determination and make appropriate changes in rules and definitions that the legislative intent can be carried out.

Id. at 649 (quotations and citations omitted); see also Dep't of Envtl. Prot. v. Cumberland Coal Res., 102 A.3d 962, 978 (Pa. 2014) (noting delegation is constitutional where it contains "primary guidelines" and reflects "basic policy choices"); Kan. One-Call Sys., Inc. v. State, 274 P.3d 625 (Kan. 2012) (upholding delegation to administrative body because power was limited to "adopting necessary rules for carrying out provisions" and body was "not given free rein to create new rules unrelated to those specified provisions"); accord Dep't of Transp. v. Ass'n of Am. R.R., __ U.S. __, 135 S. Ct. 1225, 1250-51 (2015) (Thomas, J., concurring) (observing that Supreme Court's intelligible principle test "requires nothing more than a minimal degree of specificity in the instructions Congress gives to the Executive when it authorizes the Executive to make rules having the force and effect of law" and noting court "has almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law" (quotation omitted)).

¶ 15. Most persuasive is the line of cases examining legislative delegations in the context of insurance rate approval. For example, in Blue Cross of Massachusetts v. Commissioner of Insurance, the Supreme Judicial Court of Massachusetts considered whether a statute empowering the Commissioner of Insurance to review proposed rates constituted an "unconstitutional grant of

9

unfettered discretion." 489 N.E.2d 1249, 1255 (Mass. 1986). The Commissioner could not approve rates if they were "excessive, inadequate, or unfairly discriminatory"; he was permitted to disallow rates if the benefits provided were "unreasonable in relation to the rate charged"; and any cost containment activities had to be "acceptable to him." Id. at 1251, 1255 (quotations omitted). The Massachusetts high court noted that "broad delegations of authority" are not constitutionally violative and that "even very general legislative guides are sufficient if appropriate judicial review procedures are provided." Id. at 1255-56 (alterations and quotations omitted). Accordingly, the court concluded that the Commissioner did not have unfettered discretion and that "no improper delegation [had] been made" as the Commissioner's discretion was "modified by the standard of 'demonstrated impact.' " Id. At 1256. The court observed that the meaning of the phrase "acceptable to him," as understood by the Commissioner, to require judgment on the "soundness, scope, and adequacy" of the insurer's review and cost containment activities, demonstrated his authority was properly construed in light of the "general, but clear" demonstrated impact standard. Id. at 1255, 1256; see also Retired Pub. Emps. Ass'n v. Cuomo, 123 A.D.3d 92, 97-98 (N.Y. App. Div. 2014) (observing that power given to Civil Service Commission to modify health insurance contribution rates permissible where "the basic policy decisions underlying the actions authorized have been made and articulated by the Legislature," such that there was no need for "a specific and detailed legislative expression authorizing a particular executive act" (quotations and alterations omitted)); Blue Cross of Ne. Ohio v. Ratchford, 416 N.E.2d 614, 618 (Ohio 1980) (validating delegation of authority to deny rate increases when Superintendent of Insurance finds proposed rates "lawful, fair, and reasonable" and good faith effort had not been made to contain costs, because containment of medical costs was permissible delegation of General Assembly's discretionary functions, judicial review was available, and "[f]urther guidance would be impractical").

¶ 16. Here, GMCB's discretion is curtailed by considerations of affordability, the promotion of quality care and access to care, insurer solvency, and fairness, as well as by the requirement that it consider the opinion of the Department of Financial Regulation. 8 V.S.A. § 4062(a)(3). That these terms are general and open-ended reflects the practical difficulty of establishing "more detailed, narrow or explicit standards" in this field, a difficulty due to the fluidity inherent in concepts of quality care, access, and affordability given advancements (and setbacks) in technology, medicine, employment, and economic well-being. Hunter, 2004 VT 108, ¶ 31; Beverly Enters.-Fla., 739 So.2d at 649. Accordingly, "flexibility is required," Hunter, 2004 VT 108, ¶ 31, to accomplish the Legislature's goals of achieving universal access and coverage; containing costs; improving the quality of care; maintaining a transparent, efficient, and accountable healthcare system; and financing healthcare in a way that is "fair, predictable, transparent, [and] sustainable." 18 V.S.A. § 9371(11); see also Blue Cross of Ne. Ohio, 416 N.E.2d at 617 ("[W]hen the discretion to be exercised relates to a police regulation for the protection of . . . health . . . , and it is impossible or impracticable to provide such standards, and to do so would defeat the legislative object sought to be accomplished, legislation conferring such discretion may be valid and constitutional without such restrictions and limitations."). Finally, "appropriate judicial review procedures are provided" because, as demonstrated here, an insurer may appeal GMCB's decisions to our Court. Blue Cross of Mass., 489 N.E.2d at 1256; 8 V.S.A. § 4062(g).

¶ 17. Consequently, in consideration of the above decisions of this Court, our sister states, and the United States Supreme Court, which have observed that there is no delegation if the legislation in question "provides a general statement of policy, together with a right to judicial review, of any administrative action taken," Blue Cross of Ne. Ohio, 416 N.E.2d at 618, we are satisfied that the standard governing GMCB's review contained in 8 V.S.A. § 4062(a)(3) provides

11

sufficient guidelines such that the statute does not constitute an improper delegation of legislative power.[3]

¶ 18. MVP next argues that even if GMCB's grant of discretion is found constitutional, its decision in this case should nonetheless be reversed because its conclusions "are not supported by specific findings on the statutory criteria required for approval of health insurance rates." MVP alleges that the decision "fails to provide an adequate basis for review by this Court," as GMCB both failed to explain how the proposed rate did not promote access to quality healthcare and was unfair, unjust, and inequitable to plan members while simultaneously ignoring the relevant evidence and basing its decisions on factors "that have no nexus [to] the proposed rates." We agree and, accordingly, reverse and remand for GMCB to make specific findings, based on the statutory factors, to support its conclusions.

¶ 19. We approach this issue deferentially. This Court "will not interfere with the decision of an administrative board made in the performance of a discretionary duty in the absence of a showing of abuse of discretion resulting in prejudice to one of the parties." Vincent, 148 Vt.

---

[3] MVP also argues that other "related constitutional grounds" mandate a finding that the statute is unconstitutional: the statute "denies MVP equal protection of the laws," as the absence of specific criteria "allows the Board to exercise its unfettered discretion in a discriminatory fashion," and it is so vague that it "violates MVP's due process rights because it fails to give fair notice as to what is required for approval." We decline to address these specific claims in full for two reasons. First, the arguments are referenced only briefly "[a]long with the delegation doctrine" in the "standard of review" section of MVP's primary argument regarding unconstitutional delegation. The brief alludes to broad principles in only three cases and fails to elucidate how the actual language of the statute is insufficiently precise or how GMCB exercised its discretion in a discriminatory manner in this case. See In re Boardman, 2009 VT 42, ¶ 20, 186 Vt. 176, 979 A.2d 1010 (noting that "inadequately briefed" claims "need not be addressed"). Second, our above analysis—and the cases we rely on—answer these questions, insofar as we are holding that the statute contains sufficient specific criteria and precise standards to render it constitutional. See Whitman v. Am. Trucking Ass'ns., 531 U.S. 457, 475 (2001) (remarking that "even in sweeping regulatory schemes, [the United States Supreme Court] has never demanded . . . that statutes provide a 'determinate criterion' "); Melendy, 109 Vt. at 451 (noting that Legislature may delegate the responsibility to "fill up the details" of statute's general provisions (quotation omitted)); Beverly Enters.-Fla., 739 So.2d at 646 (finding that phrases such as "adequate and appropriate health care" are "terms of common usage and understanding" and as such statute was not unconstitutionally vague).

12

at 536, 536 A.2d at 929.  Therefore, we "will not delve into the reasons for the Board's actions absent evidence of an abuse in the exercise of its discretion." Id. at 536-37, 536 A.2d at 929.

¶ 20.  This Court has consistently affirmed the necessity of the clear application of applicable standards in both judicial and administrative decisions.  We have emphasized that decisions "arrived at without reference to any standards or principles [are] arbitrary and capricious; such ad-hoc decision-making denies [an] applicant due process of law." In re Miserocchi, 170 Vt. 320, 325, 749 A.2d 607, 611 (2000) (citation omitted).  We have also been firm that "[a]dequate findings of fact are required, so that we may determine whether the sound discretion implicitly mandated by [a] statute was in fact exercised." State v. Powers, 136 Vt. 167, 169, 385 A.2d 1067, 1068 (1978); see also Kanaan v. Kanaan, 163 Vt. 402, 407, 659 A.2d 128, 132 (1995) ("[W]e will not speculate as to the basis upon which the court made its findings and reached its conclusions, where the court's decision does not spell out this basis."); Richard v. Richard, 146 Vt. 286, 287, 501 A.2d 1190-91 (1985) ("The purpose of findings is to provide a clear statement as to what was decided and why; where no indication appears of the method employed and weight accorded various factors, remand is necessary.").

¶ 21.  Here, as MVP has observed, GMCB made seven[4] numbered conclusions of law.[5] The first five of these summarize four circumstances: (1) the rate increase is large and unprecedented; (2) the rate filing, exacerbated by the mathematical error, was late and gave inadequate time for GMCB's review and proper notice to policyholders; (3) the plan was mislabeled as transitional; and (4) MVP represented that the 2014 filing was the last for this plan,

---

[4]  The seventh conclusion is simply "[i]n conclusion, we decline to approve the filing and any requested rate increase and encourage the carrier to evaluate the plan's continued viability and affordability prior to any future request for additional rate increases."

[5]  We have used the term "conclusions of law" because GMCB labeled them as such. As seen by the descriptions of each "conclusion" in the text, this is a loose description of such.

13

and GMCB's approval of the 2014 rate increase was induced by this fact and the requirement that MVP notify policyholders of this fact. The actual holding is in two sentences:

> The above-described events, taken together, illustrate a lack of accountability to the Board as well as to the Agri-Services membership, and lead us to conclude that the proposed rates do not promote access to quality health care and are unfair, unjust, and inequitable to plan members. In addition, because this filing represents only a small portion of MVP's overall business, our decision to deny the rate increase will have a nominal impact on the carrier's solvency.

Its overall conclusion was to "decline to approve the filing and any requested rate increase." Its order was to disapprove the filing "resulting in no increase over Agri-Services' December 2014 rate previously approved by the Board."

¶ 22. Although the standard of review precludes reversal absent a compelling indication of error, in this instance, we must conclude that GMCB's explanation of its reasoning is too sparse to show how the "events" supported its decision and were consistent with the statutory standards in 8 V.S.A. § 4062(a)(3). Two of the events appear to support the conclusion that they "illustrate a lack of accountability to the Board"—the mislabeling of the nature of the plan and the failure to follow through on the 2014 representation that MVP would discontinue the plan. It is unclear, however, how these events relate to the statutory standards and why the proper remedy for these facts is to deny approval of any rate increase.

¶ 23. The other two "events" appear to better reflect the statutory standards but are inadequately explained. We understand that high insurance rates that may be unaffordable to some do not promote access to health care, but we find that obvious conclusion incomplete without some evaluation of the alternative methods of obtaining health care coverage that might be more affordable. We do not find the fact that the rate increase is substantial or unprecedented alone sufficient reason to deny a rate increase. Our decision is tempered by the fact that the rates are

14

driven by claims costs, as the actuaries found, and purchase of a policy under the plan is voluntary.[6] Based on the actuarial report, the likely result of denying any rate increase will be to require MVP to withdraw the plan rather than running it at a substantial loss. Although GMCB has apparently concluded that this result is desirable, it has failed to explain why.

¶ 24.    We have a similar reaction concerning the lateness of the filing and the errors in the calculation. Although we acknowledge GMCB's concern that MVP repeatedly provided late, incomplete, or incorrect information in making its rate filing, we need a better understanding of how these actions relate to the statutory standard and justify a denial of any rate increase.

¶ 25.    We stress that our holding does not necessarily mean that the findings relied upon by GMCB are entirely irrelevant. For example, the 2014 Agri-Services decision and approval of the approximate 14.9% rate increase was "expressly premised" on MVP's confirmation that the filing would be Agri-Services' last, as the increase would cover the cost of notifying members that the plans would no longer be available and that they should enroll in a Vermont Health Connect plan for 2015.[7] As that filing was not Agri-Services' last, GMCB could have reasonably concluded that the current rate—and, consequently, any increases of that rate—was unfair, unjust, and inequitable, as the 2014 increase did not reflect an additional cost to the insurer. Similarly, in submitting a late, erroneous rate filing, MVP delayed GMCB's ninety-day statutory review, such that Agri-Services could not notify members of the increase at least thirty days prior to the date when the increase would take effect. GMCB could have concluded that plan members were thus forced to decide whether to continue their coverage without any idea of what rates they would be required to pay, or cancel, research, and purchase another plan, thus potentially experiencing a gap

---

[6]  Indeed, as GMCB noted, Agri-Services decision to continue the plan was apparently driven by consumer demand. It experienced a 96.7% membership retention rate as of June 2015.

[7]  Indeed, as GMCB noted, the inverse took place: Agri-Services experienced a 96.7% membership retention rate as of June 2015, prompting it to permit members to renew their plans in 2015.

in coverage. Moreover, if GMCB had approved the rate increase, members would have been billed retroactively for additional premiums. Accordingly, GMCB would have been well within its statutory discretion to conclude that in creating uncertainty for policy holders and exposing them to the risk of retroactive charges for premium increases, MVP dissuaded members from pursuing necessary medical care and in so doing, failed to promote access to health care.

¶ 26. While we can see why the procedure may have prejudiced policyholders in obtaining alternative health insurance if they chose not to pay the rate increase—indeed the findings with respect to the ability of policyholders to enroll in Vermont Health Connect suggested that a transition might be difficult—GMCB's decision failed to explain the nature and extent of the prejudice. To that end, we emphasize again that our conclusion here does not necessarily mean that the findings relied upon by GMCB are irrelevant or that it cannot provide a sufficient explanation for its decision. Nor are we suggesting that a rate increase decision must be based solely or primarily on traditional public utility rate regulation concerns and methods. See, e.g., In re Quechee Serv. Co., 166 Vt. 50, 53, 690 A.2d 354, 359 (1996). We cannot conclude, based on the record before us, that GMCB has given us an adequate explanation to determine the reasons for GMCB's decision and how they are consistent with the statutory standards.

Reversed and remanded for further proceedings consistent with this opinion.

FOR THE COURT:

_____
Associate Justice

16