NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2024 VT 2

No. 23-AP-084

| | |
|---|---|
| In re Petition of Vermont Gas Systems, Inc. (Catherine Bock, Appellant) | Supreme Court |
| | On Appeal from Public Utility Commission |
| | October Term, 2023 |

Anthony Z. Roisman, Chair

James A. Dumont, Law Office of James A. Dumont, PC, Bristol, for Appellant.

Owen J. McClain and Matthew J. Greer of Sheehey Furlong & Behm P.C., Burlington, for Appellee Vermont Gas Systems, Inc.

Eric B. Guzman, Special Counsel, Montpelier, for Appellee Vermont Department of Public Service.

PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.

¶ 1. **COHEN, J.** This appeal concerns an order of the Vermont Public Utility Commission approving a contract under 30 V.S.A. § 248(i) for the purchase of out-of-state renewable natural gas by petitioner, Vermont Gas Systems, Inc. (VGS). On appeal, intervenor Catherine Bock disputes the Commission's findings with respect to the contract's contribution towards satisfying emissions reductions under the Vermont Global Warming Solutions Act of 2020, 2019, No. 153 (Adj. Sess.) (GWSA). Intervenor also challenges the Commission's finding that the contract, with a condition imposed by the Commission, will comply with least-cost planning principles. For the reasons that follow, we affirm.

## I. Facts & Procedural History

¶ 2.    The following facts are drawn from the Commission's decision adopting the hearing officer's findings of fact and are undisputed unless otherwise noted.  In June 2022, VGS petitioned the Commission, pursuant to 30 V.S.A. § 248(i),[1] for the approval of a contract with Archaea Energy Marketing LLC (Archaea).  The contract, which has an initial term of fourteen-and-a-half years, requires VGS to purchase a minimum volume of renewable natural gas (RNG) that will be produced and transported from a landfill operated by Archaea in Waterloo, New York. The contract was part of an effort by VGS to invest in nonfossil gas (such as RNG) and incorporate RNG into its gas supply for the purpose of meeting regulatory requirements and reducing greenhouse gas emissions.

¶ 3.    Among its many provisions, the contract allows VGS to annually increase the purchase volume of RNG from Archaea by a specific amount.  It also allows VGS to either retain RNG it purchases or designate volumes of RNG for Archaea to resell through renewable transportation fuel markets.[2]  If VGS exercises its option to resell RNG into those markets, its share of the proceeds would be applied towards the total cost of the RNG purchased, thereby reducing the cost for its customers.

¶ 4.    In response to the petition, and upon the recommendation of the Department of Public Service, the Commission initiated an investigation into the contract pursuant to § 248(i)(3)

---

[1] In general, 30 V.S.A. § 248(i) requires a company to obtain the Commission's approval of certain types of contracts.  This includes any contract for the purchase of out-of-state gas and exceeds a period of five years.  Id. § 248(i)(1)(B).

[2] Although not entirely clear based on the record and briefing, the resale option apparently does not simply concern the resale of physical RNG through renewable transportation fuel markets.  Rather, it appears that the resale option contemplates the sale of carbon credits that are associated with RNG.  In essence, RNG is assigned a carbon intensity which translates into one ton of carbon avoided, and the amount of carbon avoided through RNG is assigned a value that entities can purchase as a credit.  Entities purchasing RNG-associated credits do so to meet both federal obligations and state-mandated caps on carbon emissions.  For the purpose of simplicity, however, we refer to resales of any type pursuant to the contract's option as the resale of RNG.

and appointed a hearing officer to conduct proceedings. Intervenor, a ratepaying customer of VGS, successfully moved to intervene. According to intervenor, the purpose of her intervention was to protect her interest, as a ratepayer, of any increase to rates for an energy source that intervenor claimed has no environmental benefit.

## A. Hearing Officer's Proposal For Decision and Findings of Fact

¶ 5. After receiving prefiled testimony, exhibits, and public comments, and after conducting an evidentiary hearing, the hearing officer submitted a proposal for decision containing findings of fact and recommending that the Commission approve the contract subject to the Department's proposed condition. Relevant here, the hearing officer determined that, for any volumes of RNG resold into the transportation fuel markets, VGS would apply its share of the proceeds against the overall cost of RNG within its supply portfolio. This would allow VGS to "buy down" the cost of the RNG volumes delivered to VGS's retail customers.

¶ 6. The hearing officer found that the contract would provide meaningful and appreciable environmental benefits, relying on a host of supportive predicate findings. In particular, the hearing officer found that VGS had a three-pronged strategy for reducing greenhouse gas emissions and for responding to regulatory and legal requirements (including the GWSA): (1) weatherization and efficiency; (2) in-home installations of devices such as heat pump water heaters, hybrid heating systems, and geothermal systems; and (3) supply of low-carbon alternative energy sources such as RNG. The contract was intended to further VGS's third strategy. The hearing officer found that RNG has a carbon intensity of twenty-six percent to forty-three percent less than its geologic gas counterpart. As such, each unit of geologic gas displaced by RNG in VGS's supply portfolio would result in a reduction of greenhouse gas emissions by those amounts. Thus, the hearing officer found that if VGS replaced ten percent of the geologic gas contained in its supply portfolio with RNG, it would reduce its greenhouse gas emissions by approximately four percent.

3

¶ 7.    The hearing officer found that the contract was also consistent with the Vermont 2022 Comprehensive Energy Plan, which itself was intended by the Department to effectuate the emission reduction goals required under the GWSA.  Underlying that finding was evidence concerning not only the environmental benefits associated with the contract, but also the contract's cost-effectiveness.  The hearing officer determined that the best method for assessing the cost-effectiveness of the contract's environmental benefits would be to compare the cost paid for RNG under the contract with the "social cost of carbon."  This method provides a dollar estimate of the future damage caused by a metric-ton increase in carbon dioxide emissions or, equivalently, the benefits of reducing those emissions by the same amount in a given year.  The hearing officer found that the contract would be consistent with the Comprehensive Energy Plan and the GWSA if the cost paid for emission reductions resulting from RNG remained below the calculated social cost of carbon.

¶ 8.    The proposed decision also detailed the regulatory backdrop of the contract, specifically VGS's regulatory obligations and prior decisions by the Commission endorsing VGS's purchase of RNG as a way to reduce greenhouse gas emissions.  The hearing officer concluded that the contract satisfied those obligations.  In particular, the hearing officer found that the contract was consistent with VGS's alternative regulation plan approved by the Commission pursuant to 30 V.S.A. § 218d, and VGS's most recent integrated resource plan approved by the Commission under 30 V.S.A. § 218c.  The hearing officer found that both plans contemplated VGS's increase of RNG in its supply portfolio as part of an effort "to limit VGS's greenhouse gas emissions."  And the contract would satisfy traditional least-cost planning principles, as required under VGS's integrated resource plan, if VGS exercised its resale option to ensure that the premium cost of RNG passed on to its customers "does not exceed the cost of carbon reductions effectuated by the RNG acquired under the [c]ontract."  In the context of least-cost planning, the hearing officer explained that "[c]omparing the premium paid for RNG under the [c]ontract against

4

the cost of greenhouse gas reductions is a reasonable means" for assessing whether the contract is cost-effective financially and environmentally.

¶ 9.     The proposed decision addressed arguments raised by intervenor throughout the proceedings.  With respect to the contract's environmental benefits, the hearing officer noted the dispute over "whether and to what extent such benefits will in fact materialize."  While the hearing officer credited the concerns raised by intervenor's expert witness about the extent of RNG's environmental benefits, resolving the dispute was "not material because it is clear that the parties agree that there will be some level of greenhouse gas reductions."  The hearing officer pointed to testimony by intervenor's expert that greenhouse gas emissions would be reduced by at least twenty-six percent for every unit of geologic gas displaced by RNG.  The hearing officer acknowledged the risk that this estimate of RNG's environmental benefits could be affected by future refinements of the method for calculating RNG's carbon intensity.  But the hearing officer found that risk was sufficiently mitigated because the contract allows VGS to increase supply, decrease supply, or resell RNG.  Thus, the hearing officer found that the methods used by VGS to calculate the contract's potential greenhouse gas reductions were "sufficiently accurate."

¶ 10.     The proposed decision also addressed intervenor's argument that the contract would not sufficiently move VGS towards meeting the GWSA emissions reduction obligations. The hearing officer agreed that the contract would not single-handedly meet the GWSA's reduction obligations, but noted that the contract was only one aspect of VGS's "multi-faceted approach to reducing greenhouse gas emissions and meeting GWSA mandates."  Although other approaches—such as efficiency, weatherization, and in-home appliance installations—may prove to be more cost-effective than RNG in terms of reducing greenhouse gas emissions, the hearing officer observed that some of VGS's customers "are unable to fuel switch away from natural gas in the near-term future, whether for financial or logistical reasons."  The RNG to be purchased under the contract would be aimed at reducing emissions for those customers.

5

B. Commission's Approval of the Contract

¶ 11. In November 2022, the Commission issued an order adopting the hearing officer's proposed decision and approving the contract. The Commission found the contract to be consistent with statewide energy and policy objectives contained in the Comprehensive Energy Plan and the GWSA, as well as VGS's existing regulatory obligations.

¶ 12. The Commission responded to numerous arguments raised by intervenor. It rejected intervenor's contention that the contract was out of step with the GWSA. In doing so, it reiterated the hearing officer's reasoning for why the contract furthered the GWSA's greenhouse gas reduction obligations and highlighted the evidence underlying that determination. As for intervenor's argument regarding the contract's cost-effectiveness, the Commission found that any revenues generated from the resale of RNG "will serve to put downward pressure on rates" and that the contract does not permit VGS "to generate windfalls or excess profits through the sale of RNG attributes." To ensure the contract remained cost-effective and was consistent with least-cost planning principles, the Commission adopted the Department's proposed condition incorporating the social cost of carbon as a method for measuring the contract's cost-effectiveness.

¶ 13. The Commission also rejected intervenor's challenges to numerous factual findings, including intervenor's contention that VGS failed to adequately demonstrate how the contract would displace natural gas demand or its emissions. It noted that VGS must pursue all cost-effective approaches for reducing the impact of greenhouse gas. That obligation, the Commission observed, included VGS's customers who would continue to use natural gas, renewable or otherwise. It emphasized VGS's responsibility to those customers, with the contract being "only one component of a broader array of measures that VGS intends to implement to address its overall greenhouse gas emissions."

¶ 14. Intervenor moved for reconsideration, largely arguing the same claims of error raised in this appeal. In January 2023, the Commission issued an order denying intervenor's motion. This appeal followed.

## II. Analysis

¶ 15. This Court generally reviews decisions of the Commission with deference and, in doing so, "we accord a strong presumption of validity to the [Commission's] orders." In re Stowe Cady Hill Solar, LLC, 2018 VT 3, ¶ 15, 206 Vt. 430, 182 A.3d 53 (quotation omitted) (alteration in original). We have previously explained that "[i]n a § 248 proceeding, the [Commission] is engaged in a legislative, policy-making process." In re Twenty-Four Elec. Utils., 160 Vt. 227, 233, 627 A.2d 355, 359 (1993) (quotation omitted). "Out of respect for the expertise and informed judgment of agencies, and in recognition of this Court's proper role in the separation of powers, we accord agency decisions substantial deference." In re Portland Street Solar LLC, 2021 VT 67, ¶ 12, 215 Vt. 394, 264 A.3d 872 (quotation omitted).

¶ 16. On appeal, intervenor does not challenge the criteria that the Commission used to evaluate the contract under 30 V.S.A. § 248(i).[3] Nor does intervenor raise arguments that the Commission erred as to questions of law.[4] Instead, intervenor argues that the Commission's

---

[3] Intervenor concedes that 30 V.S.A. § 248(i) does not require the Commission to make any specific findings when deciding to approve a contract that falls within the statute's purview. Section 248(i) is silent on that front, and that silence stands in contrast to other subsections. See id. § 248(b) (delineating findings that Commission must make in granting certificate of public good). On its face, § 248(i) affords the Commission with substantial discretion over whether to even initiate investigative proceedings or issue a decision regarding approval. Id. § 248(i)(3) (providing that Commission may initiate investigation, but contract will be deemed approved if Commission fails to do so within thirty days and issue decision within 120 days after initiation of investigation). Given intervenor's concession, we leave for another day what, if any, particular facts the Commission must find when it decides to investigate and render a decision on a petition under § 248(i).

[4] In some instances, intervenor speculates that the Commission might have intended to render legal interpretations and, if it did, erred as to questions of law. These one-sentence arguments, however, are not adequately briefed, and we decline to review them to the extent they are actually raised. See Kneebinding, Inc. v. Howell, 2020 VT 99, ¶ 61, 213 Vt. 598, 251 A.3d 13 ("Mere naked statements, unsupported by argument or citation of authorities, constitute inadequate

decision must be reversed and remanded because the evidence in the record does not support its factual findings.

¶ 17. Accordingly, the scope of our review is narrow and restricted. We uphold factual findings made by the Commission unless they are clearly erroneous. Stowe Cady Hill Solar, 2018 VT 3, ¶ 15; see also 30 V.S.A. § 11(c) ("Upon appeal to the Supreme Court, [the Commission's] findings of fact shall be accepted unless clearly erroneous."). To demonstrate clear error, intervenor carries a heavy burden. In re Vt. Elec. Power Co., 2006 VT 69, ¶ 6, 179 Vt. 370, 895 A.2d 226. "Only when we have reviewed the entire record and have been left with the definite and firm conviction that a mistake has been committed will we hold a finding to be clearly erroneous." In re Vt. Elec. Power Co., 131 Vt. 427, 432, 306 A.2d 687, 690 (1973). Thus, so long as the Commission's factual findings are supported in the evidentiary record, those findings will not be overturned for clear error. Vt. Elec. Power Co., 2006 VT 69, ¶ 10.

## A. GWSA

¶ 18. Intervenor argues that the Commission clearly erred in finding that the contract would sufficiently implement the GWSA's greenhouse gas reduction requirements. We disagree.

¶ 19. To provide some relevant context to this claim, a brief examination of the GWSA is useful. Effective as of September 2020, the GWSA represents the Legislature's response to the growing climate crisis caused by greenhouse gas emissions. 2019, No. 153 (Adj. Sess.), § 2, [https://perma.cc/AVC5-4SXS] (cataloging legislative findings). It provides, in part, that the state of Vermont "shall" reduce greenhouse gas emissions by "not less than 40 percent from 1990

briefing and merit no consideration." (quotation omitted)). Moreover, the record and the parties' briefing leave us with little doubt that the claims of error focus solely on the Commission's findings of fact. And to the extent that the Commission considered statutes and other regulatory directives for rendering its decision, we do not exercise pure de novo review of the Commission's interpretations. Instead, we defer "to an administrative agency's interpretation of a matter within its legislatively delegated expertise" and will dispense with that deference only if the interpretation is "plainly incorrect." Zlotoff Found., Inc. v. Town of South Hero, 2020 VT 25, ¶ 21, 212 Vt. 63, 231 A.3d 1146 (quotation omitted).

greenhouse gas emissions by January 1, 2030 pursuant to the State's 2016 Comprehensive Energy Plan." Id. § 3(a)(2); 10 V.S.A. § 578(a)(2). To facilitate the reduction requirements, "all State agencies shall consider any increase or decrease in greenhouse gas emissions in their decision-making procedures" with respect to, inter alia, "the purchase and use of equipment and goods." 2019, No. 153 (Adj. Sess.), § 3(c); 10 V.S.A. § 578(c). To assist in implementing its objectives, the GWSA created the Vermont Climate Council. 10 V.S.A. § 591(a). The GWSA requires the Council to adopt a Vermont Climate Action Plan setting forth "specific initiatives, programs, and strategies that the State shall pursue to reduce greenhouse gas emissions; achieve the State's reduction requirements pursuant to section 578 of [Title 10]; and build resilience to prepare the State's communities, infrastructure, and economy to adapt to the current and anticipated effects of climate change." Id. § 591(b)(2); id. § 592(a)-(b). Among its many requirements, the Climate Action Plan must identify initiatives, programs, and strategies that will "reduce greenhouse gas emissions from the transportation, building, regulated utility, industrial, commercial and agricultural sectors." Id. § 592(b)(1). In December 2021, the Council issued its Climate Action Plan.

¶ 20. In January 2022, the Department issued a Comprehensive Energy Plan which implements state-wide energy policies, including the greenhouse gas reduction requirements under the GWSA and the Climate Action Plan. See 30 V.S.A. § 202b(a). By statutory mandate, the Comprehensive Energy Plan must "seek to implement the State energy policy set forth in section 202a of [Title 30], including meeting the State's greenhouse gas emissions reductions requirements pursuant to [the GWSA], and shall be consistent . . . with the Vermont Climate Action Plan." Id. § 202b(a). And the Comprehensive Energy Plan makes clear that its primary purpose is to "be consistent with the requirements of the GWSA and the [Climate Action Plan]" and to be used in a manner to implement the underlying policy objectives. Vt. Dep't of Pub. Serv., 2022 Vt. Comprehensive Energy Plan, 15 (Jan. 14, 2022) [https://perma.cc/A329-QSR4].

¶ 21. With this backdrop in mind, we now turn to the substance of intervenor's claim. Intervenor challenges the Commission's finding that the VGS-Archaea contract would result in a displacement of geologic gas and result in a reduction in greenhouse gas emissions. According to intervenor, that finding lacks support in the record. Intervenor asserts that the Commission has apparently approved the contract on the basis that it will implement the requirements of the GWSA without any evidence to support that the contract will result in reduced emissions.

¶ 22. These arguments, however, misapprehend "displacement" as that term was used by the Commission and overlook the evidence in the record. The Commission found that the "primary environmental benefit of the [c]ontract will be to displace geologic natural gas with RNG." This finding was supported by the testimony of VGS's witness, Gregory Morse. Morse testified that one of VGS's three strategies for reducing greenhouse gas emissions, consistent with the GWSA, was to provide existing customers with alternative low-carbon energy supplies such as RNG to "displace" traditional natural gas.

¶ 23. The genesis of intervenor's misunderstanding of "displacement" appears to be testimony from intervenor's expert witness, Emily Grubert. Grubert understood displacement to require that the contract "actually results in lower fossil natural gas demand." But the record reveals that the Commission did not find that the contract would displace <u>demand</u> for natural gas. Rather, the record demonstrates that the Commission found that RNG purchased under the contract would displace geologic gas that would have otherwise been <u>consumed</u> by VGS customers "who are unable to fuel switch away from natural gas in the near-term future."

¶ 24. The record is replete with evidence supporting the Commission's conclusion that RNG purchased under the contract would reduce greenhouse gas emissions by replacing the geologic gas to be consumed by VGS's customers. Both the Department's witness and VGS's witness testified that the contract would allow VGS to purchase an amount of RNG representing ten percent of VGS's total demand. Between the testimony from the Department's witness and

10

intervenor's expert, the evidence establishes that RNG has a carbon intensity of twenty-six percent to forty-three percent less than its geologic gas counterpart. Thus, for every unit of RNG consumed in place of geologic gas, greenhouse gas emissions would be reduced by a percentage within that range. Grubert also testified that if VGS managed to satisfy ten percent of its demand with RNG (as opposed to geologic gas), VGS would reduce its overall greenhouse gas emissions by up to four percent. Crediting Grubert's testimony, the Commission found that if VGS replaced "[ten percent] of geologic natural gas from its projected supply portfolio by 2030 with RNG purchased under the [c]ontract, there would be an approximate [four percent] reduction of VGS's projected 2030 greenhouse gas emissions that would otherwise occur in the absence of the [c]ontract."

¶ 25. As for whether the contract's potential reduction in greenhouse gas emissions furthered the GWSA's requirements, the Commission acknowledged that the contract, "by itself, will not enable VGS to meet its GWSA obligations." But it reiterated that "RNG is only one component of VGS's broader approach to mitigating its climate impact." The contract represented one of VGS's three strategies to reduce emissions pursuant to the GWSA, namely, adding new sources of low-carbon alternative energy such as RNG to displace traditional natural gas for customers unable to immediately pivot to nongas energy sources.

¶ 26. Given that the Comprehensive Energy Plan was structured to implement the GWSA's reduction requirements, the Commission understandably focused on the contract's consistency with that Plan. The evidentiary record supports the Commission's conclusion that it was. According to the Department's witness, the contract would be consistent with the Comprehensive Energy Plan so long as the contract was managed to keep the cost paid for emissions reductions below the social cost of carbon. Notably, the Comprehensive Energy Plan itself endorses the use of RNG as a vehicle to contribute towards the GWSA's reduction

11

requirements.[5] In it, RNG is cited along with electricity, advanced wood heat, and biofuels as a renewable energy source to meet the reduction requirements of the GWSA. Comprehensive Energy Plan, at 186. Since the "lifecycle [greenhouse gas emissions] from RNG can be far lower than conventional natural gas," the Plan promotes the use of RNG as a low-carbon fuel. Id. at 22, 134. It further provides that RNG can be used to "displace traditional natural gas in carbon-intensive sectors such as space heating, process heating, and transportation." Id. at 209.

¶ 27. In sum, the Commission did not uncritically accept the evidence supporting the use of RNG as a means to reduce greenhouse gas emissions consistent with the broad policy aims contained in the GWSA. The Commission recognized Grubert's concerns with the carbon-intensity calculations that VGS used to assess RNG's environmental benefits, and it also highlighted VGS's concession that the contract "is not a panacea for mitigating the climate impacts of its core business practices." The Commission exercised its expert judgment by weighing the evidence adduced by the parties. The record evidence adequately supports the Commission's findings that (1) the contract is one of three strategies that VGS has implemented to contribute towards greenhouse gas emissions reductions under the GWSA by substituting RNG with geologic gas, (2) RNG is twenty-six percent to forty-three percent less carbon-intensive than geologic gas, (3) the contract has the potential to reduce VGS's overall greenhouse gas emissions by approximately four percent, and (4) the contract is consistent with the Comprehensive Energy Plan and the broader policy objectives of the GWSA. Because these findings are supported by the

---

[5] As the Commission recognized, the Vermont Climate Action Plan also briefly discusses RNG as a means towards meeting the GWSA reduction requirements. Indeed, it acknowledges that energy transition to weatherization and heat-pump systems "cannot happen overnight" since many Vermonters "are tied to investments they made in fossil vehicles or heating systems" that they will need to use in the near term. Vt. Climate Council, Initial Vt. Climate Action Plan, 36 (Dec. 2021) [https://perma.cc/87AE-GFTT]. As an example of a multi-faceted approach, the Climate Action Plan cites to VGS's expansion of weatherization services "and increasing the amount of [RNG] in their system." Id. at 36-37. Although RNG is not viewed as a source for energy cost savings, it "can provide [greenhouse gas emissions] reductions when replacing fossil fuels." Id. at 35.

evidentiary record, they are not clearly erroneous.[6] In re Adelphia Bus. Sols. of Vt., Inc., 2004 VT 82, ¶ 11, 177 Vt. 136, 861 A.2d 1078.

B. Least-Cost Planning and Comparative Analysis of Alternatives

¶ 28. Intervenor next claims that the Commission clearly erred in finding that the contract complied with traditional least-cost planning principles. Intervenor argues that replacing geologic gas with RNG is a costly means to reduce greenhouse gas emissions when compared to other alternative energy sources. According to intervenor, VGS failed to provide a comparative analysis of RNG with those other sources, rendering the Commission's finding on this topic clearly erroneous.

¶ 29. Intervenor correctly notes that pursuant to 30 V.S.A. § 218c, every regulated gas utility must prepare and implement a "least-cost integrated plan" setting forth how the utility will meet energy services in an effective and cost-efficient manner. 30 V.S.A. § 218c(a)(1). The plan must account for the associated economic costs by factoring in "the State's progress in meeting its greenhouse gas reduction goals" and "the value of the financial risks associated with greenhouse gas emissions from various power sources." Id. § 218c(a)(1)(A)-(D). The Commission has labeled the components of § 218c(a)(1) as "least-cost planning principles." Petition of Vt. Gas Sys., Inc., for a certificate of public good, pursuant to 30 V.S.A. § 248, No. 7929, 2013 WL 2456016, at *15 (Vt. Pub. Serv. Bd. May 31, 2013) (observing that "least-cost planning principles

---

[6] Intervenor also appears to argue, in cursory fashion, that the Commission failed to articulate how it reached its conclusion that the contract would reduce greenhouse gas emissions. See In re MVP Health Ins. Co., 2016 VT 111, ¶ 20, 203 Vt. 274, 155 A.3d 1207 (reaffirming requirement that agency must provide adequate findings of fact for reaching decision). As can be surmised by our recitation of the Commission's reasoning and the factual findings it relied upon to reach its conclusion, intervenor's claim is without merit. See In re Cont'l Tel. Co. of Vt., 150 Vt. 76, 77, 549 A.2d 639, 640 (1988) (rejecting claim of inadequate findings where Commission's findings and conclusions were "replete with analyses of the parts of the expert testimony which was accepted and rejected" before rendering decision).

generally[] are described in 30 V.S.A. § 218c(a)(1)"). Once a regulated gas utility formulates a plan, it must submit its plan to, and receive approval from, the Commission. 30 V.S.A. § 218c(b).

¶ 30. VGS has an approved integrated resource plan pursuant to § 218c. See Petition of Vt. Gas Sys., Inc. for approval of its 2020 Integrated Resource Plan, No. 21-0167-PET, 2021 WL 4877582, at *5 (Vt. Pub. Util. Comm'n Oct. 13, 2021). VGS's plan expressly contemplated adding RNG to its portfolio as an energy source to assist meeting its customers' demand for natural gas, notwithstanding a potential increase of overall rates by 2.6 percent per year. Id. at *2. But the plan also acknowledged that RNG has a "variety of benefits" and that VGS would procure RNG from nonlocal sources. Id. Although VGS "considered a variety of innovative supply and design options to meet customer demand for process fuels and heating with renewable and low-carbon sources," those technologies "are in a nascent state of development." Id. at *3. The Commission conditionally approved the plan pursuant to a memorandum of understanding between VGS and the Department. That memorandum of understanding required VGS's next integrated resource plan to analyze "steps taken to develop and apply a valuation of greenhouse gas emissions framework to inform resource procurement decisions . . . and apply to any investment decisions in the interim." Id. at *6.

¶ 31. In this proceeding, the Commission relied, in part, on VGS's approved integrated resource plan to determine whether the contract was consistent with least-cost planning principles. The Commission found VGS's integrated resource plan to be "[of] significant importance" because it "encapsulate[d] overarching planning principles." The Commission also noted that VGS's plan contemplates an increase of RNG to its supply portfolio "as part of a broader array of policies and programs that are intended to limit VGS's greenhouse gas emissions." Thus, "[t]he [c]ontract, on its face, is consistent with and promotes the high-level objectives set out in VGS's [integrated resource plan]."

¶ 32. We note that the Commission has previously looked to a utility's integrated resource plan to determine whether a proposal satisfies least-cost planning principles. See Joint Petition of Vt. Transco LLC, Vt. Elec. Power Co. Inc., and Cent. Vt. Pub. Serv. Corp. for a certificate of public good, pursuant to 30 V.S.A.§ 248, No. 7751-PET, 2012 WL 1244417, at *15 (Vt. Pub. Serv. Bd. Apr. 6, 2012) (finding project consistent with principles of least-cost planning for purposes of 30 V.S.A. § 248(b)(6) because project conformed with integrated resource plan); In re Vt. Gas Sys., Inc., No. 6940-PET, 2004 WL 2727676, at *14 (Vt. Pub. Serv. Bd. Aug. 9, 2004) (finding project consistent with least-cost planning principles because it furthers objectives of petitioner's most recently approved integrated resource plan). Even intervenor concedes that integrated resource plans "are one means" of evaluating whether a project satisfies least-cost planning principles.

¶ 33. The Commission, however, did not merely rely on the contract's facial consistency with VGS's integrated resource plan. Its prior approval of the plan was conditioned on a requirement that VGS consider the costs of RNG relative to its environmental benefits for making investment decisions. This obligation "tether[ed] VGS's acquisition of new RNG resources to traditional least cost-planning principles" and the Commission's approval of the plan "establishes that VGS's new investments into RNG remain firmly fixed to traditional least-cost utility planning principles." To effectuate that obligation here, the Commission imposed the condition proposed by the Department—requiring VGS to manage its resale options so that the total price paid for emission reductions from RNG delivered to its customers does not exceed the social cost of carbon. The attachment of this condition was to ensure that the contract satisfies traditional least-cost planning principles. Based on the testimony and exhibits proffered by the parties, the Commission found that "[c]omparing the premium paid for RNG under the [c]ontract against the cost of greenhouse gas reductions is a reasonable means" for assessing whether the contract is financially and environmentally cost-effective.

15

¶ 34. According to intervenor, this method of evaluating least-cost planning principles is insufficient and the Commission's finding is unsupported in the absence of an analysis of alternatives to RNG such as weatherization, fuel-switching, and efficiency.[7] Assuming that such a comparative analysis is required—an issue we need not reach—the argument fails because the cited alternatives are not relevant in this context.

¶ 35. The Commission found that VGS <u>does</u> have a strategy for reducing greenhouse gas emissions by alternative means, such as implementing weatherization and efficiency. That strategy is one of three adopted by VGS. Critically, however, the contract was not a component of that strategy; instead, it fell under VGS's strategy to provide supply of low- and zero-carbon alternative energy sources such as RNG.

¶ 36. Given this understanding, the Commission construed the contract's purpose as providing lower-carbon energy sources to customers "who are unable to fuel switch away from natural gas in the near-term future, whether for financial or logistical reasons." It explained that although "other mitigation strategies, such as efficiency and weatherization may be more cost-effective than RNG at reducing net greenhouse gases, VGS provides a necessary utility service that is relied upon by thousands of Vermonters." Accordingly, the contract implemented a policy of "reducing the emissions profile of the natural gas that those customers will continue to use in a cost-effective manner." And with the Department's condition, the contract "can be a cost-effective means for VGS to reduce its overall greenhouse gas emissions." These findings are well supported by the evidence in the underlying record.

---

[7] In raising this argument, intervenor cites to other instances where the Commission required an entity seeking a certificate of public good pursuant to 30 V.S.A. § 248(a), (b), to provide a comparative analysis of supply-side and demand-side alternatives. But this matter concerns the Commission's approval of a contract under § 248(i), not its evaluation of an application for a certificate of public good under § 248(b). Therefore, the decisions cited by intervenor are inapposite. Cf. <u>Stowe Cady Hill Solar</u>, 2018 VT 3, ¶ 21 ("A fundamental norm of administrative procedure requires an agency to treat like cases alike.").

¶ 37.   It is clear from the record that, for a subset of VGS's customers, the short-term choice was between using geologic gas or the lower-carbon alternative of RNG. Consequentially, the relevant comparative analysis was between RNG and geologic gas, not between RNG and other options inappropriate for those customers' needs. We therefore decline to upend the decision below based on intervenor's argument that the Commission failed to adequately consider alternatives to RNG.

### C. Least-Cost Planning and Condition for Approval of Contract

¶ 38.   Finally, intervenor argues there is no evidence to support the Commission's finding that its adoption of the Department's social-cost-of-carbon condition renders the contract cost-effective for purpose of least-cost planning. Intervenor claims that there was no evidence that the condition would ensure that the contract is cost-effective. Intervenor also notes that the Commission found that the cost of RNG under the contract will likely exceed the market rate for natural gas for the life of the contract.

¶ 39.   This argument fails because the record contains evidence directly supporting the Commission's determination. The Department's witness testified that comparing the cost paid for RNG under the contract with the social cost of carbon was a well-established and flexible method for assessing the cost-effectiveness of the contract. That expert further testified that the contract could be cost-effective in the context of least-cost planning principles if the Commission imposed the Department's proposed condition requiring VGS to manage prices using this method. VGS's witness also testified that in order for the contract to be cost-effective, VGS would need to resell a portion of RNG into the renewable transportation fuel markets to keep the cost below the social cost of carbon. This evidence supports the Commission's conclusion that the resale option would ensure the contract's cost-effectiveness for least-cost planning purposes because the proceeds from

any sale would "serve to put downward pressure" on any potential increase in rates associated the contract.[8]

¶ 40. The Commission carefully considered whether the condition would make the contract a cost-effective means for reducing greenhouse gas emissions for a set of VGS's customers who are unable, "whether for financial or logistical reasons," to switch away from natural gas. This analysis was necessary in light of the evidence that the contract was an expensive vehicle for reducing emissions and could potentially result in increased rates. According to the Commission, weighing the environmental benefits arising from the contract against a potential increase in rates was "consistent with [its] general regulatory obligation to ensure that VGS adheres to traditional least-cost principles in providing service to its customers." In balancing these factors, the Commission was persuaded by the evidence and arguments presented by the Department concerning the condition's importance.

¶ 41. Thus, acting within the confines of its role, the Commission exercised its judgment, weighed that evidence, and utilized its expertise to determine that attaching the condition to its approval of the contract would render the contract cost-effective and consistent with least-cost planning principles. Stowe Cady Hill Solar, 2018 VT 3, ¶ 16; In re Acorn Energy Solar 2, LLC, 2021 VT 3, ¶ 125, 214 Vt. 73, 251 A.3d 899. Given that there is a sufficient evidentiary foundation for the Commission to have reached that conclusion, we can discern no clear error. Therefore, we will not disturb the decision below.

Affirmed.

FOR THE COURT:

_____
Associate Justice

---

[8] To the extent intervenor is arguing that the condition does not ensure that the contract is the cheapest option to reduce greenhouse gas emissions, intervenor offers no authority to show that such a finding is required.

18