2006 VT 112

# In re Professional Nurses Service Application for a Certificate of Need

[913 A.2d 381]

No. 05-246

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed November 9, 2006

480

*Philip H. White* and *Kathleen B. O'Neill* of *Wilson & White, P.C.*, Montpelier, and *John D. Monahan, Jr.* and *Angela R. Clark* of *Dinse, Knapp & McAndrew, P.C.*, Burlington, for Appellants Vermont Assembly of Home Health Agencies.

*William H. Sorrell*, Attorney General, and *Bridget C. Asay*, Assistant Attorney General, Montpelier, for Appellee Department of Banking, Insurance, Securities and Health Care Administration.

*Torin D. Togut*, Lawrenceville, Georgia, for Appellee Professional Nurses Service, Inc.

¶ 1. **Skoglund, J.** This is an appeal by several regional home health agencies from a decision by the Commissioner of the Department of Banking, Insurance, Securities and Health Care Administration (BISHCA or Department) granting a certificate of need (CON) to Professional Nurses Service, Inc. (PNS) to provide the full range of home health care services in Vermont. The CON effectively allows PNS to seek certification as a Medicare home health agency, and to compete for Medicare patients and other clients with the twelve regional nonprofit agencies, organized as the Vermont Assembly of Home Health Agencies (VAHHA). The regional agencies claim that, in granting the CON, the Commissioner erroneously: (1) applied provisions of the CON Guidelines; (2) concluded that the additional service was necessary to address issues of cost, care, access, and other problems within the existing system; and (3) found that the existing agencies had not remedied the identified problems. For the reasons set forth below, we affirm.

¶ 2. In January 2004, PNS filed a letter of intent with the Commissioner stating its intention to apply for a CON to become a home health agency authorized to provide a full range of home health services and thus become eligible for Medicare certification and reimbursement. 18 V.S.A. § 9440(c)(2). The following month, the Commissioner granted petitions by VAHHA and each of its twelve constituent members for interested-party status. *Id.* § 9440(c)(6). The Commissioner determined that a CON was required for the proposal, and PNS submitted its application in April of 2004.

¶ 3. Shortly thereafter, the agencies moved to dismiss the application, asserting that PNS had failed at the threshold to satisfy a mandatory statutory criterion entitling it to CON review. The agencies relied on 18 V.S.A. § 9437(5), one of the five so-called "mandatory" criteria for the granting of a CON. See *In re Prof'l Nurses Serv., Inc.*, 168 Vt. 611, 612, 719 A.2d 894, 895 (1998) (mem.) (observing, while affirming an order denying PNS's prior CON application, that "the Commissioner must consider the general criteria set forth in 18 V.S.A. § 9436(a), and to grant a CON, the Commissioner must make the five findings required by 18 V.S.A.

§ 9437, sometimes called the mandatory criteria").[1] The mandatory criterion in question requires that any proposed new health service be "consistent with the certificate of need guidelines published by the department in accordance with its rules." 18 V.S.A. § 9437(5). The agencies relied, in turn, on provisions of the then-current CON Guidelines providing that any applicant to become a Medicare-certified home health agency must demonstrate a need for the service; that in determining such need the Department shall consider the data it collects in monitoring the currently-certified home health agencies, as well as "any additional evidence of need presented by the applicant"; and further that:

> [i]f the data collected by the Department identify access, cost or quality issues in any area of the state, the Administration will encourage the agency or agencies with identified issues to remedy them, and will only consider approving additional home health agencies if the problems cannot be remedied in a timely manner.[2]

¶ 4. The agencies argued that the CON Guidelines established "a virtual moratorium on new home health agencies" until the Department had identified particular problems and afforded the appropriate agency or agencies the opportunity to remedy them. The Commissioner, however, denied the motion, observing that while the CON procedures contained no provision for the filing of a motion to dismiss, they did allow him to preliminarily assess whether problems existed within the existing home health system that required remediation by means of submitting questions and gathering additional information before ruling an application complete and suitable for consideration. See 18 V.S.A. § 9440(b)(4) (after receipt of application, Commissioner shall notify applicant whether it contains

---

[1] Act 53, a comprehensive revision of the CON process enacted in 2003, and effective July 1, 2005, substituted a single list of six criteria for the so-called permissive and mandatory criteria, but the amendment did not take effect in time to apply in this case. 2003, No. 53, § 27. All references in this opinion are to the statutes prior to the amendments.

[2] Although not applicable here, the Act 53 amendments phased out the former CON Guidelines, including the "remediation" provision, and the statutes now require that any new service be "consistent with the health resource allocation plan" issued by the Commissioner. 18 V.S.A. § 9437(1).

all necessary information and is complete, or whether "additional information is required").

¶ 5. Over the next several months, the Commissioner did, in fact, submit questions and gather additional information from both PNS and the regional agencies, and he finally ruled the application complete in December 2004. The Public Oversight Commission (POC) then held a public hearing in January 2005, at which PNS, VAHHA and its individual agencies, and members of the public were afforded the opportunity to testify and present evidence. 18 V.S.A. § 9440(c)(2). Thereafter, by a vote of eight to two, the POC recommended granting the CON with two conditions, one capping the percentage of Medicare patients to be served by PNS, and the other requiring that PNS submit the same statistical reports required of the other agencies.

¶ 6. The Commissioner subsequently served notice of his proposed decision, explained that it differed from the POC's recommendation, and provided the parties an opportunity to submit exceptions and additional briefs, evidence, and argument. 18 V.S.A. § 9440(d)(6)(A) & (B). On May 9, 2005, the Commissioner issued his decision, conditionally granting the application "pending an opportunity for the existing agencies to remedy issues of unmet need ... [as] ... required by CON Criterion number 5." The Commissioner's 31-page decision systematically addressed the general and mandatory criteria for the addition of new home health services in light of the substantial body of materials submitted by the parties, with particular emphasis on general criterion 4, 18 V.S.A. § 9436(a)(4) ("[t]he need for the proposed new institutional health service on the part of the population served or to be served"), mandatory criterion 3, id. § 9437(3) ("in the absence of the proposed new service, patients would experience serious problems in terms of costs, availability, or accessibility, or such other difficulties as may be identified by the commissioner, in obtaining care of the type proposed"), and the CON Guideline providing that the Commissioner would consider approving new home health agencies only if identified problems in the existing agencies "cannot be remedied in a timely manner."

¶ 7. The Commissioner found "a degree of unmet need in Vermont that the current agencies are not meeting." Citing the testimony, letters, and affidavits of "a significant number of competent witnesses," as well as data provided by VAHHA and the individual agencies, the Commissioner determined that approximately one percent of Vermonters in need of home health services are not

receiving those services from the regional agencies; that the existing agencies are aware of, but have failed to meet, that need; that some agency clients are not receiving services at the level, frequency, or timeliness they require; and that PNS is ready, willing, and able to fill the need.

¶ 8. The Commissioner also cited "adequate and competent evidence in the record" to support a finding, under the third mandatory criterion, that in the absence of the proposed new service "patients would experience serious problems in terms of costs, availability, or accessibility, or such other difficulties as may be identified by the commissioner . . . ." 18 V.S.A. § 9437(3). The Commissioner cited, in this regard, evidence that Vermonters had been hospitalized beyond their discharge date due to the inability of the local regional agency to provide caregivers; that one percent of Vermonters are not receiving services when and as needed; and that PNS had been compelled to turn away Vermonters who had called to request assistance due to its lack of certification to provide the full range of home health services. The Commissioner also cited evidence of significant projected growth in the segment of the population requiring home health services, and the concomitant critical need for additional full-service providers with proven track records of providing quality home-care services throughout the state, such as PNS.

¶ 9. Finally, as a means of ensuring compliance with the CON Guidelines, the Commissioner declined to grant the CON outright, ruling instead that it would become effective August 1, 2005, "unless VAHHA and the 12 individual home health agencies in Vermont demonstrate to the satisfaction of the Commissioner, on or before July 9, 2005, that they have remedied the identified issues and problems." As allowed by the Commissioner, VAHHA and the individual agencies submitted written responses with supporting documentation concerning their remediation efforts on July 11, 2005, and shortly thereafter PNS filed a response, with supporting affidavits, to the agencies' submissions. Following the submission of additional brief replies, the Commissioner issued a written decision on August 1, 2005.

¶ 10. In his nineteen page ruling, the Commissioner reviewed the agencies' "remediation" response, the heart of which was a five-week study undertaken from May 23, 2005 to June 26, 2005, in which they collected data on all institutional referrals and denials of services, individual requests for services and denials, delayed discharges due

to inadequate services, complaints concerning services, waiting lists for services, and delivered and missed home health visits. While noting that the study demonstrated a relatively low percentage of access problems during the five-week period, the Commissioner concluded that the agencies' submission had largely failed to demonstrate any "changes in policies or procedures intended or likely to remedy" problems in the provision of services previously identified by the Commissioner. Accordingly, the Commissioner determined that the agencies had not met their remediation burden.

¶ 11. The Commissioner thus ruled that the conditional CON issued on May 9, 2005, would become effective as of August 1, 2005.[3] Six of the twelve regional agencies have appealed the Commissioner's rulings.[4]

¶ 12. In evaluating the agencies' claims, it is critical at the outset to emphasize the extraordinarily narrow scope of review that we apply in this context. The Legislature has delegated to the Division of Health Care Administration, under the direction of the Commissioner, the responsibility for "carrying out the policies of the state regarding health care delivery, cost and quality, by providing oversight of health care quality and expenditures through the certificate of need program . . . ." 18 V.S.A. § 9403. In recognition of this broad delegation, we apply a highly deferential standard to decisions by the Commissioner. As we explained in an earlier dispute between these same parties, "[a]bsent a clear and convincing showing to the contrary, decisions made within the expertise of [the Commissioner] are presumed correct, valid and reasonable." *In re Prof'l Nurses Serv., Inc.*, 164 Vt. 529, 532, 671 A.2d 1289, 1291 (1996); see also *In re Prof'l Nurses Serv., Inc.*, 168 Vt. at 613, 719 A.2d at 896 (we "presume" the Commissioner's ruling is correct, and require a "compelling indication of error" to overcome that presumption); *In re AssureCare of Vt., Inc.*, 165 Vt. 535, 538, 686 A.2d 959, 961 (1996)

---

[3] The Commissioner also declined to adopt the POC's recommendation to cap the percentage of Medicare patients to be served by PNS. This ruling has not been challenged on appeal.

[4] The six agencies that have appealed are: Addison County Home Health & Hospice, Inc.; VNA & Hospice of Southwestern Vermont Health Care, Inc.; Dorset Nursing Association, Inc.; Rutland Area VNA & Hospice, Inc.; Manchester Health Services, Inc.; and Northern Counties Health Care, Inc., d/b/a Caledonia Home Health Care & Hospice.

(characterizing our standard of review in appeals from CON decisions as "very narrow").

■ ¶ 13. Furthermore, in deference to the broad decision making authority conferred by the Legislature, we will not disturb the Commissioner's "statutory interpretations absent a compelling indication of error." *In re Prof'l Nurses Serv., Inc.*, 164 Vt. at 532, 671 A.2d at 1291. Similarly, we presume the Commissioner's interpretation of the Division's own regulations is correct, and require the challenging party to "show a compelling indication of error to overcome this presumption." *In re Cent. Vt. Med. Ctr.*, 174 Vt. 607, 609, 816 A.2d 531, 535 (2002) (mem.). We will not set aside the Commissioner's findings unless clearly erroneous, viewing the evidence in the light most favorable to the decision, and excluding the effect of any modifying evidence. *Id.* at 608, 816 A.2d at 535. "So long as the findings are supported by credible evidence, we will not disturb them." *Id.* (citation omitted).

¶ 14. It is also well to recall, as we have elsewhere noted, that while the proceedings before the Commissioner here contained some elements of the usual quasi-judicial administrative process, "we do not have before us a record developed in a contested case" as we would in proceedings under the Administrative Procedure Act (APA). *Brattleboro Mem. Hosp. v. Dep't of Banking, Ins., Sec. & Health Care Admin.*, 172 Vt. 630, 631, 782 A.2d 1217, 1219 (2001) (mem.); see 18 V.S.A. § 9440(a) (exempting CON procedures from the APA). The CON application process is not governed by the rules of civil procedure or the rules of evidence. Witnesses cannot be subpoenaed and are not subject to cross-examination. The enabling statutes and regulations authorize the parties to submit, and the Commissioner to consider, a broad range of "evidence," "information," and "data" subject to none of the usual limitations on hearsay or other restrictions normally applicable in judicial or quasi-judicial proceedings. See 18 V.S.A. § 9440(a) (providing that CON application shall "contain such information as the commissioner establishes" or "deems necessary"); *id.* (providing that a CON applicant "may submit, and the commissioner shall consider, any other information relevant to the application or the review criteria"). The CON Guidelines themselves state that in determining the need for new home health agencies, the Commissioner shall consider data submitted by the agencies and "any additional evidence of need presented by the applicant."

■ ¶ 15. It is altogether fitting, therefore, that the broad information-gathering process utilized by the Commissioner in CON proceedings — similar in many respects to a quasi-legislative proceeding — be given the widest possible latitude on review. See, e.g., *In re Cent. Vt. Med. Ctr.*, 174 Vt. at 610, 816 A.2d at 537 (holding that Commissioner's interpretations must be upheld unless "arbitrary or capricious").

¶ 16. This standard does not lend itself to meaningful judicial review. Nevertheless, we are constrained by the statute and the process outlined therein. Without a record, without evidence, and without sworn testimony, the Court has no context in which to evaluate a decision of the Commissioner. If the Legislature is unsatisfied with our role in the process, then the only remedy is to amend the process itself.

¶ 17. With these standards and limitations in mind, we turn to the several contentions raised by the agencies on appeal. First, they claim that the Commissioner failed to comply with the requirements of the third CON Guideline providing that, when data collected by the Department identify "access, cost or quality issues in any area of the state, the Administration will encourage the agency or agencies with identified issues to remedy them, and will only consider approving additional home health agencies if the problems cannot be remedied in a timely manner." The agencies renew the argument, raised in their earlier unsuccessful motion to dismiss, that this provision precludes the Commissioner from considering a CON application for new home health services until an existing agency has received notice of identified problems and had an opportunity to remedy them.

¶ 18. The Commissioner rejected this assertion, concluding that the CON Guidelines considered as a whole plainly contemplate the identification and remediation of existing problems within the context of the CON application process. The first two CON Guidelines provide that applicants to become a Medicare-certified home health agency must meet all statutory criteria and demonstrate a need for the service, and further provide that in determining such need the Department may consider any data collected to monitor the existing agencies as well as "any additional evidence of need *presented by the applicant.*" (Emphasis added.) The Commissioner also noted that the procedures to identify and remedy existing problems *during* the application process were readily at hand. By first seeking additional information from the parties before ruling an application

complete, and setting for a hearing before the POC, and second, by issuing notice of his proposed decision, he provided the agencies with an opportunity to address the issues of unmet need before granting a CON.

¶ 19. The Commissioner's interpretation of the CON Guidelines to authorize such an approach to the review and remediation process was a reasonable one in light of the Guideline's language and overall context. While other procedures — such as deferring consideration of the application until after a suitable remediation period — might have also been acceptable, we cannot conclude that the Commissioner's method even approaches the level of capriciousness or compelling error necessary for judicial intervention. Accordingly, the ruling must be upheld. See *In re Cent. Vt. Med. Ctr.*, 174 Vt. at 610, 816 A.2d at 537 (Commissioner's construction of regulations will be upheld "absent any express direction by the Legislature or any compelling indication of error," and "[s]o long as the Commissioner's interpretation is not arbitrary or capricious, we will allow it to stand").

¶ 20. Relying on the same CON Guideline, the agencies also claim that the Commissioner was required to make specific findings "differentiat[ing] between different areas of the state in evaluating whether there existed serious access problems," rather than identifying issues that existed statewide. Although the Commissioner declined to attribute to particular agencies the identified problems of missed visits, staffing shortages, delayed discharges, and other concerns, his findings were based expressly on data that were both aggregated and agency-specific, as well as on the extensive testimony and affidavits of individual clients and healthcare providers concerning their experiences with specific agencies. The Commissioner also observed that the agencies had consistently maintained that they function "statewide as one coordinated system" to provide the most efficient coverage, and thus concluded that it was not unreasonable to evaluate the system as an integrated whole. Mindful that we are charged with upholding the Commissioner's ruling absent "compelling indication of error," *In re Prof'l Nurses Serv., Inc.*, 164 Vt. at 532, 671 A.2d at 1291, we cannot conclude that the Commissioner's interpretation was so clearly erroneous, arbitrary, or capricious as to compel reversal.

¶ 21. The agencies also claim that the evidence failed to support the Commissioner's conclusion that PNS had satisfied the third

mandatory criterion by demonstrating that "in the absence of the proposed new service, patients would experience serious problems in terms of costs, availability, or accessibility, or such other difficulties as may be identified by the commissioner, in obtaining care of the type proposed." 18 V.S.A. § 9437(3). The agencies assert that the "anecdotal" evidence of a few individuals was insufficient to support the Commissioner's finding of delayed hospital discharges due to the inaccessibility of home health care, and argue that the data failed to show that any sizeable number of Vermonters were not receiving home health care when and as needed, were experiencing delayed or diverted admissions, or were subject to serious, statewide access problems.

¶ 22. The Commissioner expressly considered and rejected the agencies' claim that the evidence offered by individual clients and health care providers recounting delayed discharges, missed or delayed home-health visits, and inadequate training and under-staffing was an unreliable basis for his findings. The Commissioner observed that, in most cases, the evidence consisted of "first person testimony, under oath, of facts of which the witnesses had first hand knowledge." The Commissioner also found that "nowhere does the law of CON require, nor does it favor, statistical evidence over first hand knowledge," rejecting as nonbinding a sentence in the "policy" section preceding the CON Guidelines stating that, to date, no party had adduced "objective information" demonstrating systemic problems within the existing agencies. The Commissioner further observed in this regard that the provision requiring a showing of serious problems within the existing system did "not carry with it a threshold of a certain number of Vermonters who must be lacking in services," subsequently opining that it was important to view the data as representing "individual consumers in need of services" rather than lifeless numbers and percentages.

¶ 23. As noted, we must uphold the Commissioner's statutory and regulatory interpretations absent compelling indication of error, and its factual findings unless clearly erroneous. *In re Cent. Vt. Med. Ctr.*, 174 Vt. at 608-09, 816 A.2d at 535. The Commissioner was well within his broad discretion here in determining the evidentiary threshold necessary to demonstrate "serious problems" within the existing system, in weighing the reliability of the evidence presented, and in assessing its overall probative value. Considered in light of this standard, the data, testimony, and affidavits submitted by the

agencies and PNS provide a credible basis to support the Commissioner's decision. Nothing further was required.

¶ 24. Finally, the agencies assert that the Commissioner's August 1, 2005 decision on remediation was erroneous in a number of respects. Their principal claim is that the Commissioner erred in ruling that their evidence was deficient. As noted, the bulk of the agencies' remediation submission consisted of a five-week study undertaken from May 23, 2005 to June 26, 2005, in which they collected data on all institutional referrals and denials of services, individual requests for services and denials, delayed discharges due to inadequate services, complaints concerning services, waiting lists for services, and delivered and missed home health visits. While acknowledging that the study revealed relatively low percentages of missed visits or other access problems during the period in question, the Commissioner found that it was fundamentally unresponsive to his charge that the agencies outline their efforts to remedy previously identified problems. The agencies' submission, in the Commissioner's view, was aimed principally at rearguing the issue, previously decided, as to whether the evidence supported a finding of serious problems within the existing home health system, rather than attempting to "indicate any changes in policies intended or likely to remedy the access issues." The Department notes, as an example, that the agencies might have formulated plans and procedures to reduce the number of missed visits by retaining back-up caregivers, or outlined a strategy to address the chronic problem of understaffing by increasing nurse training programs, recruiting new nurses and nurses aides, or enticing retired nurses back into the workforce. In addition, the Commissioner observed that while the number of missed visits by caregivers during the five-week period was not high as an overall percentage, "when viewed as representing individual consumers in need of services rather than as a percentage of missed visits compared to visits delivered, [the data] indicates that hundreds of Vermonters were not provided services during the time period studied."

¶ 25. The agencies claim, with some merit, that the favorable data contained in the five-week study were not entirely irrelevant to the remediation question. Nevertheless, it was within the Commissioner's broad discretion to determine whether the study set forth real remedial changes or merely, as he concluded, additional data "stress[ing] [the] statistical significance of missed visits as opposed to the impact [that] missed visits have on individuals and their

families." We will not second-guess the Commissioner's judgment in such matters absent a compelling showing of error, a showing which the agencies have not made here. See *In re Cent. Vt. Med. Ctr.*, 174 Vt. at 610, 816 A.2d at 537 (holding that it was within Commissioner's discretion to determine the standard of "need" for new institutional health services and decide whether that standard had been met).

¶ 26. The agencies raise a number of additional claims which require little extended discussion. They renew their assertion that the Commissioner improperly failed to make agency-specific findings, arguing that their study revealed minimal problems among the six agencies pursuing this appeal. As discussed, however, the Commissioner's decision to focus on statewide needs within the system was not unreasonable, and certainly cannot be characterized as so clearly erroneous or capricious as to compel reversal.

¶ 27. The agencies also contend the Commissioner erred in: (1) overruling their objection to two affidavits submitted by PNS which cited practices that occurred prior to the remediation period; (2) failing to exclude from consideration data from programs in which PNS already has authority to participate; (3) declining to distinguish between medically necessary services and supportive nonmedical services in evaluating the missed-visit data; and (4) refusing to permit the agencies to respond to the twenty-one affidavits submitted by PNS in their remediation response. As noted, the Commissioner's decision was based on his conclusion that the agencies' five-week study was "limited in its probative value because it studie[d] a limited universe of services in a limited time frame and because it stresse[d] statistical significance of missed visits as opposed to the impact missed visits have on individuals and their families." Clearly none of the foregoing issues, whatever their individual merit, exercised any tangible influence on the Commissioner's ruling, or on his core conclusion that the agencies' study was largely unresponsive to the remediation question.

¶ 28. The agencies also renew their argument that the Commissioner erred in referring to "anecdotal" evidence contained in the individual affidavits submitted by PNS, some of which were anonymous or contained hearsay. As we have explained, however, the CON procedures do not limit the Commissioner's consideration to statistical evidence or evidence that would be admissible in judicial proceedings, and the PNS affidavits plainly did not, in any event, affect the core of the Commissioner's holding. Lastly, the agencies assert that the Commissioner applied "standardless" decision making in his

remediation ruling. They predicate the claim on the Commissioner's failure to specify "performance standards" for missed visits or delayed or diverted admissions. As noted, however, the Commissioner reasonably determined — within his broad discretion — that a finding of serious problems within the existing system did not require proof of a particular percentage of missed visits, and similarly that a showing of remediation did not, in his considered judgment, turn upon evidence meeting a minimal statistical standard. Absent a compelling showing of error in this regard, we find no basis to disturb the judgment.

*Affirmed.*