NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2025 VT 53

No. 24-AP-326

| | |
|---|---|
| In re Central Vermont Medical Center Fiscal Year 2025 | Supreme Court |
| | On Appeal from<br>Green Mountain Care Board |
| | May Term, 2025 |

Owen Foster, Chair

Shapleigh Smith, Jr., Anne B. Rosenblum, and Alexander Hunter of Dinse P.C., Burlington, for
  Appellants Central Vermont Medical Center, Inc. and the University of Vermont Medical
  Center, Inc.

Charity R. Clark, Attorney General, and Ryan P. Kane, Deputy Solicitor General, Montpelier, for
  Appellee Green Mountain Care Board.

Bridget Asay and Michael Donofrio of Stris & Maher LLP, Montpelier, for Amicus Curiae Blue
  Cross and Blue Shield of Vermont.

PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.

¶ 1. **CARROLL, J.** Central Vermont Medical Center (CVMC) appeals from the Green Mountain Care Board's determination of its fiscal year 2025 (FY25) budget. The Board found that CVMC failed to justify the proposed growth rates in its budget submission and modified the budget to adhere more closely to the Board's benchmarks. CVMC argues on appeal that the Board: (1) had no constraints on its discretion and issued an arbitrary and capricious order; (2) failed to identify standards by which hospital budgets would be evaluated, in violation of CVMC's procedural due process rights; and (3) failed to regulate CVMC's revenue on a per-capita basis, in violation of the Board's enabling legislation. We reject these arguments and affirm the Board's decision.

¶ 2.    We begin with an overview of the hospital budget-review process, which constitutes one of the Board's core regulatory duties.  See 18 V.S.A. §§ 9375(b)(7), 9456.  The review process, including the factors the Board must consider, is governed by statute and informed by the Board's rules.  See id. § 9456(a)-(h); Green Mountain Care Board Rule 3.000, Code of Vermont Rules 80 280 003 [hereinafter Board Rule], http://www.lexisnexis.com/ hottopics/codeofvtrules.  The Board's mission "is to drive system-wide improvements in access, affordability, and quality of health care to improve the health of Vermonters," and "hospital budget review is one lever" through which this can be accomplished.  Green Mountain Care Board, FY 2025 Hospital Budget Guidance & Reporting Requirements, at 4 [hereinafter FY25 Guidance], https://gmcboard.vermont.gov/sites/gmcb/files/documents/FY25%20Guidance%20Updated%20 041823_0.pdf [https://perma.cc/Z7NW-XE3J].

¶ 3.    The Board establishes proposed hospital budgets annually and must issue its budget decisions by October 1.  18 V.S.A. § 9456(d)(1).  By March 31 each year, the Board adopts guidance and establishes benchmarks for hospitals to use in developing their budgets.  See Board Rule § 3.202 ("On an annual basis, the Board will establish benchmarks for any indicators for use in developing and preparing the upcoming fiscal year's hospital budgets" and "[t]he established benchmarks shall be included in the uniform reporting manual, which shall be provided to the hospitals by March 31."); 18 V.S.A. § 9456(e) (enabling Board to "establish a process to define, on an annual basis, criteria for hospitals to meet, such as utilization and inflation benchmarks").

¶ 4.    While each budget is reviewed on its own merit, the benchmarks "recognize the system-wide approach necessary for improving health care affordability" and "underscore the importance of hospital financial sustainability to ensure Vermonters' continued access to high quality care."  FY25 Guidance at 4.  Compliance with the benchmarks presumably "reflect[s] a budget that considers both health care affordability and hospital financial sustainability."  Id. at 8. This "assum[es] valid, reasonable, and appropriate budget assumptions and a complete

2

submission," all of which the Board considers "in assessing hospital budgets relative to these benchmarks." Id.

¶ 5.     "The Board may adjust the proposed budgets of hospitals that do not meet the established benchmarks."   Board Rule § 3.305; see also Board Rule § 3.303 (explaining that hospital's compliance with benchmarks "guide[s] the Board" in deciding "whether or not to adjust a hospital's proposed budget").  Hospitals bear the burden of justifying their proposed budgets. Board Rule § 3.306(a).

¶ 6.     The Board issued its FY25 Guidance in March 2024.  It set a benchmark for net patient service revenue (NPR) growth at 3.5% over FY24.  As the Board noted, NPR is "the net revenue a hospital receives for the patient services it provides" and it "includes two forms of revenue: fee-for-service . . . and fixed prospective payments."  The Board explained how increased spending, which results in increased NPR for hospitals, has a negative impact on affordability.  It considered the 3.5% NPR growth benchmark "in line with the total cost of care (TCOC) growth target in the Vermont All Payer Model."  FY25 Guidance at 8.

¶ 7.     The guidance required hospitals proposing growth rates above this benchmark to "provide justification, including credible and sufficient supporting evidence that the excessive growth reflects an improvement in access or quality of care."  Id.  It cited, as examples, "increased access as justified by lower projected wait times and a means to achieve them, population growth as justified by demographic trends and projected increases in new patient volumes, etc."  Id.  While the benchmark was "relative to current year budget," the Board explained that it would "also consider hospital prior year actuals, and projected current year performance relative to the respective NPR growth budgeted for those years."  Id.  The Board expected hospitals "with material differences between budget and actual or projected NPR FY23 or FY24 . . . to address that variation as part of its justification for budgeted FY25 NPR."

¶ 8.    The guidance provided similar information for budget requests that exceeded the Board's 3.4% commercial rate growth benchmark.  The Board explained that "[c]ommercial rate growth" means "the total increase in negotiated rate (or price) that a hospital receives from commercial health insurers."  "Hospitals proposing budgets that exceed this growth rate" needed "to justify this request with sufficient and credible evidence of hospital efficiency and maximized productivity of resources."  FY25 Guidance at 9.  The guidance provided examples of such evidence, including "average work RVUs per clinical FTE by department, both the level and the associated percentile of national benchmarks, or similar; measures of hospital cost and efficiency used by leadership to assess operational efficiency, both the level and the associated percentile of national benchmarks, or similar; etc."  Id.

¶ 9.    The guidance also "outline[d] the key measures and data sources that [would] be used to further analyze and evaluate budget requests and provide a basis for understanding operating factors that might play a role in a hospital's ability to meet the [established] benchmarks."  Id.  "Where appropriate," the Board would "compare Vermont hospitals to peer groups."  Id.  The guidance explained that there were "no specific performance benchmarks" for the measures considered in the "comparative analysis" section because "many of these measures must be considered collectively and [might] apply differently to different hospitals."  Id.  It provided details about the information necessary for the Board's review and the relevance of that information, including: "key performance metrics" such as "revenue trends, operating efficiency, [and] financial health;" identification of budget assumptions and the data that would be used to evaluate those assumptions; "contextual information" "used to provide insights about the broader context of healthcare needs in the community, the hospital's role and ability to meet those needs, as well as external pressures on hospital care delivery," and the purpose served by such information; a budget narrative that addressed specific questions identified by the Board in the

4

guidance; and a list of required materials and exhibits that hospitals must file for their budget requests to be considered complete. Id. at 11, 13.

¶ 10. In its proposed FY25 budget, CVMC requested NPR growth of 11.9% and a commercial rate increase of 5.5%, both of which exceeded the Board's benchmarks of 3.5% and 3.4%, respectively. Following several hearings and an opportunity for public comment and testimony from the Office of the Health Care Advocate, the Board issued its budget decision, modifying CVMC's budget as described below.

¶ 11. At the outset of its decision, the Board emphasized Vermont's health care affordability crisis, explaining that "the commercial market in Vermont cannot afford the current cost of care." The Board found that health insurance premiums had increased significantly, which made it more difficult for many Vermonters to afford care. For commercial rate increases to slow, the statewide health system needed to curb spending, and access to health care also needed improvement.

¶ 12. The Board explained in detail its statutory obligations in reviewing hospital budgets. For reasons set forth in its decision, the Board set CVMC's FY25 NPR growth at not more than 6% over its FY24 approved budget and its commercial rate growth at not more than 3.4% over its FY24 approved commercial rate. The Board made numerous findings with respect to various methods for considering the accuracy and reasonableness of CVMC's budget predictions as well as gauging efficiency, which we do not repeat here.

¶ 13. The Board concluded that CVMC failed to justify its request for 11.9% NPR growth and a 5.5% commercial negotiated rate increase. CVMC based its proposed commercial rate growth in part on its estimate of the rate increases expected from public payers. In other words, projected expense growth that was not covered by Medicaid and Medicare was shifted to the commercial population. The Board rejected as not credible CVMC's assumption that its Medicare rate would increase by only 0.4%. Given the recent trend of CVMC's actuals varying significantly

5

from its budget, with FY24 commercial NPR projected to exceed its budget, and its FY24 operating revenue projected to exceed its budget by 5.7%, the Board expressed concern that a high commercial rate increase based on a low Medicare rate assumption would lead to unnecessarily high commercial NPR growth.

¶ 14.  The Board was also unpersuaded by CVMC's assertion that its requested 11.9% NPR growth and 5.5% commercial rate increase were necessary to offset significant expenses.  It found that CVMC's recent operating expenses had been higher than budgeted, with FY24 operating expenses projected to exceed CVMC's budget by 3.9%.  Recent margins had also been poor, with FY23 actual total margin at -8.3%, and projected FY24 total margin at 0.5%.  For FY25, CVMC projected that its operating expenses would increase by approximately $20 million as compared to FY24.  The Board found that this could further reduce CVMC's already-low days-cash-on-hand figure.

¶ 15.  The Board concluded that, while greater expenses could be offset by increased NPR and commercial price, they could also be reduced with effective cost containment.  It found that CVMC did not justify its above-benchmark commercial negotiated rate request with credible evidence of efficiency and maximized productivity of resources, as described in the guidance.  CVMC's clinical productivity was low, as reflected in the data CVMC submitted, and the hospital had long wait times.  With this unmet demand and room for improved productivity, the Board determined that CVMC could generate NPR without reliance on price increases above the established benchmark.  In addition to low productivity, CVMC also had high administrative expenses.  The Board found no evidence of administrative savings at CVMC and the evidence indicated that expense reduction was a viable method of obtaining a positive margin.

¶ 16.  The Board found that CVMC's standardized price further supported its decision to set a commercial negotiated rate increase lower than CVMC requested.  In 2022, before CVMC's 12.5% commercial rate increase in FY23 and 5% increase in FY24, CVMC's standardized price

6

compared to national hospitals was average. Given the Board's statutory obligation to promote efficient and economic operation of hospitals under 18 V.S.A. § 9456(c)(3), the Board concluded that increasing commercial price at the rate proposed by CVMC was not a sustainable budgetary solution. It reasoned that, while CVMC might need more in NPR than the benchmark, it had not provided sufficient justification for high utilization projections that would necessitate NPR growth of 11.9%.

¶ 17. The Board thus held that an appropriate budget incorporated a 6% increase to CVMC's NPR and a 3.4% increase to commercial negotiated rate. The Board found that CVMC could achieve this NPR growth with effective cost-reduction strategies and improvements to clinical productivity, which would help increase access and shorten long wait times. It added that CVMC should make every effort to shift care that did not need to be at the hospital to more clinically appropriate settings.

¶ 18. The Board concluded that these modifications to CVMC's budget promoted efficient operations and balanced CVMC's current financial needs with the Board's obligation to "ensure universal access to and coverage for high-quality, medically necessary health services for all Vermonters" under 18 V.S.A. § 9371(1). The modifications also aligned with the Board's duty to contain "[o]verall health care costs" and ensure that "growth in health care spending . . . balance[d] the health care needs of the population with the ability to pay for such care." Id. § 9371(2). The Board imposed specific terms and conditions on CVMC's FY25 budget consistent with its decision. This appeal followed.

¶ 19. CVMC first challenges the validity of the Board's decision, arguing that it resulted from the Board's exercise of "unfettered discretion." According to CVMC, the Board did not disclose in advance the standards it would use to analyze hospital budgets and there were no limits on the Board's ability to adjust proposed budgets. CVMC maintains that the metrics provided in the guidance were largely unfinalized and scattershot and they imposed no guardrails on the

Board's decision-making. CVMC further asserts that its procedural due process rights were violated because it lacked advance notice of the basis on which its budget would be judged and it was denied a meaningful opportunity to respond. Finally, CVMC contends that the Board acted inconsistently with 18 V.S.A. § 9372(2) by failing to regulate CVMC's revenue on a per-capita basis rather than in the aggregate.

¶ 20. Our review of the Board's decision is deferential. "[D]ecisions made within the [Board's] expertise . . . are presumed correct, valid and reasonable, and will not be overturned unless there is clear and convincing evidence to the contrary." In re ACTD LLC, 2020 VT 89, ¶ 18, 213 Vt. 276, 250 A.3d 590 (quotation omitted). "Where warranted by the evidence, an administrative board's findings of fact are conclusively binding on this Court." In re MVP Health Ins. Co., 2016 VT 111, ¶ 10, 203 Vt. 274, 155 A.3d 1207 (quotation omitted). We will sustain "the interpretation of a statute by the administrative body responsible for its execution . . . absent compelling indication of error." Town of Killington v. State, 172 Vt. 182, 192, 776 A.2d 395, 403 (2001) (quotation omitted). We similarly presume that an agency's interpretation of its "own regulations is correct, and require the challenging party to show a compelling indication of error to overcome this presumption." In re Pro. Nurses Serv. Application for Certificate of Need, 2006 VT 112, ¶ 13, 180 Vt. 479, 913 A.2d 381 (quotation omitted). We review questions of constitutional law de novo. MVP Health Ins., 2016 VT 111, ¶ 10. As set forth below, we reject CVMC's challenges to the Board's decision.[*]

¶ 21. In support of its first argument, CVMC cites cases where parties challenged statutes on the basis that they represented unconstitutional delegations of legislative authority to agency decisionmakers. CVMC relies on MVP Health Insurance, 2016 VT 111, ¶ 20, for the proposition

---

[*] Amicus Blue Cross/Blue Shield of Vermont argues that this case is moot. Because no party raises this claim, we do not address it. See, e.g., Nat'l Comm'n On Egg Nutrition v. F.T.C., 570 F.2d 157, 160 n.3 (7th Cir. 1977) (concluding that argument raised in amicus brief not properly before court as argument was not made by party below or on appeal). Even if we were to address this argument, we would reject it for the reasons identified by CVMC in its reply brief.

that "[a]n agency's decision is only lawful if it results from the use of clear, identifiable standards." CVMC suggests that this case is like In re Handy, where we deemed a statute "unconstitutional because it [gave] town selectboards unbridled discretion . . . with no standards to limit the exercise of that discretion." 171 Vt. 336, 337, 764 A.2d 1226, 1230 (2000).

¶ 22. We are unpersuaded by these arguments. As we emphasized in MVP Health Insurance, "duly enacted laws represent an improper delegation of the Legislature's law-making function only if they are devoid of any conceivable standard to guide and constrain discretion." 2016 VT 111, ¶ 12 (emphasis added). The key "is whether there are 'any standards' for the exercise of discretion." Id. ¶ 13 (citation omitted); cf. In re Handy, 171 Vt. at 337, 764 A.2d at 1230.

¶ 23. In MVP Health Insurance, a health insurance carrier argued that the statute governing the Green Mountain Care Board's review of rate filings "failed to provide 'sufficient, concrete guidance' as to the meaning of the terms 'affordable,' 'promotes quality care,' and 'promotes access to health care,' or direction as to what evidence [the Board] should consider when making these statutory determinations." 2016 VT 111, ¶ 11. We rejected that argument, noting that it was sufficient under the law if legislative delegations were "as definite as was reasonably practicable under the circumstances," mindful of the difficulty that may exist in "creat[ing] more detailed, narrow or explicit standards," as well as the need for "flexibility." Id. ¶ 13.

¶ 24. We held that the Board's discretion in reviewing rate filings was "curtailed by considerations of affordability, the promotion of quality care and access to care, insurer solvency, and fairness, as well as by the [statutory] requirement that it consider the opinion of the Department of Financial Regulation." Id. ¶ 16. "That these terms are general and open-ended reflects the practical difficulty of establishing more detailed, narrow or explicit standards in this field, a difficulty due to the fluidity inherent in concepts of quality care, access, and affordability given

9

advancements (and setbacks) in technology, medicine, employment, and economic well-being." Id. (quotation omitted). "Accordingly," we concluded, "flexibility is required to accomplish the Legislature's goals of achieving universal access and coverage; containing costs; improving the quality of care; maintaining a transparent, efficient, and accountable healthcare system; and financing healthcare in a way that is 'fair, predictable, transparent, [and] sustainable.' " Id. (quoting 18 V.S.A. § 9371(11)) (additional quotation omitted).

¶ 25.    The insurer in MVP Health Insurance also argued that the Board failed to make specific findings tailored to the statutory criteria to support its conclusions. It was in the context of this argument that we reiterated the need for "clear application of applicable standards in both judicial and administrative decisions" and stated that "decisions arrived at without reference to any standards or principles [are] arbitrary and capricious" and "such ad-hoc decision-making denies [an] applicant due process of law." Id. ¶ 20 (quotation omitted); see also Lewandoski v. Vermont State Colls., 142 Vt. 446, 453-54, 457 A.2d 1384, 1388 (1983) (recognizing that U.S. Supreme Court "has defined an 'arbitrary' decision as one '[f]ixed or arrived at through an exercise of will or by caprice, without consideration or adjustment with reference to principles, circumstances, or significance' " (quoting U.S. v. Carmack, 329 U.S. 230, 243 n.14 (1949))). We also emphasized the need for sufficient findings of fact to allow for appellate review. We ultimately reversed and remanded the Board's decision in MVP Health Insurance because the Board failed to adequately explain how the "events" identified in its findings "supported its decision [to deny the insurer's rate-increase request] and were consistent with the [applicable] statutory standards." 2016 VT 111, ¶ 20.

¶ 26.    We are faced with a much different situation here. CVMC raises piecemeal arguments that do not capture the Board's budget-review process as a whole. The statutory scheme, Board rules, and FY25 Guidance are replete with "standard[s] to guide and constrain [the Board's] discretion." Id. ¶ 12. As the Board explained in its decision, its review "is guided by its

statutory purpose (18 V.S.A. § 9372), its duty to regulate consistent with the principles of health care reform (18 V.S.A. § 9371; [id.] § 9375(a)), its obligation to establish budgets with the considerations for hospital budget review specifically set forth in statute (18 V.S.A. § 9456), and the benchmarks established annually against which proposed budgets are evaluated (18 V.S.A. § 9456(e); GMCB Rule 3.000, §§ 3.202, 3.305).

¶ 27. The guidance provided greater detail about what the Board expected from hospitals and what would be considered during the review process. This included a requirement that hospitals requesting NPR growth rates in excess of the benchmark "provide justification, including credible and sufficient supporting evidence that the excessive growth reflects an improvement in access or quality of care." FY25 Guidance at 8. The Board cited, as examples, "increased access as justified by lower projected wait times and a means to achieve them, population growth as justified by demographic trends and projected increases in new patient volumes, etc." Id. Board "staff [would] also consider hospital prior year actuals, and projected current year performance relative to the respective NPR growth budgeted for those years." Id. The Board expected those hospitals "with material differences between budget and actual or projected NPR FY23 or FY24 . . . to address that variation as part of its justification for budgeted FY25 NPR." Id.

¶ 28. The guidance provided similar information for hospitals seeking to exceed the commercial-rate benchmark. They needed to provide "sufficient and credible evidence of hospital efficiency and maximized productivity of resources," and the Board offered specific examples of such evidence. Id. at 9.

¶ 29. The Board may use general standards. See, e.g., MVP Health Ins., 2016 VT 111, ¶ 13. It was not required, as CVMC suggests, to identify a "quantifiable standard by which efficiency or productivity [would] be judged," or set benchmarks for each of the metrics relevant to "clinical productivity" and "operating efficiency." The fact that it did not do so does not render its decision making "standardless" or arbitrary. The standards are not intended to be personal to

11

each hospital–they are general standards applicable to hospitals throughout the state. This is consistent with the Board's mission "to drive system-wide improvements in access, affordability, and quality of health care to improve the health of Vermonters," FY25 Guidance at 3, as well as the "fluidity inherent in concepts of quality care, access, and affordability," MVP Health Ins., 2016 VT 111, ¶ 16.

¶ 30. This is equally true of the standards set forth in the guidance for hospitals seeking to exceed the Board's benchmarks. The Board was not required to identify precisely how each hospital must justify its above-benchmark requests; it employed general descriptions that allowed hospitals to understand the type of evidence it sought. Different hospitals can show that "excessive growth reflects an improvement in access or quality of care" differently and the common-sense terms used in the statute and the guidance are readily understood, particularly given that hospitals engage in this process annually. FY25 Guidance at 8. While CVMC may prefer a different approach, it fails to show that the Board's discretion in reviewing hospital budgets is unfettered.

¶ 31. The Board considered the evidence provided by CVMC to justify its budget consistent with the statute and the guidance. It explained why it rejected CVMC's request for an 11.9% increase in its NPR and a 5.5% increase in its commercial rate. The Board focused on affordable and appropriate health care and containing health care costs. It made extensive findings supporting its decision. It found, among other things, that there were efficiencies CVMC could achieve to contain costs and offset expenses rather than increasing revenue. It further found that CVMC's data showed that 47.7% of its physicians' FTEs were in specialty areas performing below the 25th percentile, with 69.7% below the 50th percentile. The hospital also had long wait times, with 21% of new patients waiting between 91-180 days to be seen. CVMC's Medicare-payment-to-cost ratio was less than its peer median, which indicated inefficient expense management. For these and numerous other reasons, the Board concluded that a 6% NPR and 3.4% commercial rate would improve efficient and economic operation of the hospital.

¶ 32. While CVMC disagrees with the Board's conclusions, it fails to make a clear and convincing showing that the Board's decision was standardless, arbitrary, or unsupported by the evidence. There were numerous standards limiting the Board's discretion and they were "as definite as was reasonably practicable under the circumstances," mindful of the difficulty that may exist in "creat[ing] more detailed, narrow or explicit standards," as well as the need for "flexibility." MVP Health Ins., 2016 VT 111, ¶ 13. While a decision lacking any standards might be arbitrary and capricious, that plainly is not the case here.

¶ 33. Our discussion above largely disposes of CVMC's procedural due process argument as well. "[T]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Stone v. Town of Irasburg, 2014 VT 43, ¶ 27, 196 Vt. 356, 98 A.3d 769 (quotation omitted). "The touchstone in evaluating such claims is whether the parties are sufficiently apprised of the nature of the proceeding so that there is no unfair surprise." In re Amend. #1 to FY23 Accountable Care Org. Budget Ord., 2024 VT 38, ¶ 25, __ Vt. __, 323 A.3d 969 (quotation omitted). "The question on review is not the adequacy of the original notice or pleading but is the fairness of the whole procedure." Id. (quotation omitted).

¶ 34. As discussed above, the statutory scheme, rules, and FY25 Guidance provided hospitals with adequate notice of the standards governing the Board's budget-review process. The Board provided guidance about what information it would consider in reaching its decision, including the type of information that hospitals should provide in support of budget requests that exceeded the benchmarks, and it reviewed such information in reaching its decision. CVMC fails to show that it was unfairly surprised by the process, that it was denied a meaningful opportunity to participate in the budget-review process, or that the whole procedure was unfair.

¶ 35. Finally, we reject CVMC's assertion that the Board was required to regulate expenditures on a per-capita basis. CVMC asserts that 18 V.S.A. § 9372(2) imposes this obligation on the Board. Section 9372, entitled "Purpose," expresses the legislature's intent "to create an

independent board to promote the general good of the State by," among other things, "reducing the per-capita rate of growth in expenditures for health services in Vermont across all payers while ensuring that access to care and quality of care are not compromised." This is one of five broad goals set forth in § 9372. The other goals identified in this section are: "improving the health of the population"; "enhancing the patient and health care professional experience of care"; "recruiting and retaining high-quality health care professionals"; and "achieving administrative simplification in health care financing and delivery." Id. § 9372(1), (3)-(5); cf. 18 V.S.A. §§ 9371(1)-(14) (adopting various principles "as a framework for reforming health care in Vermont," which do not include reducing per-capita rate of growth in expenditures for health services in Vermont across all payers).

¶ 36. The goals set forth in § 9372 inform the functions of the Board, but they do not mandate the specific way in which the Board's duties are exercised. Cf. 18 V.S.A. §§ 9375(a), (b)(7) (stating that "Board shall execute its duties," including "[r]eview[ing] and establish[ing] hospital budgets pursuant to chapter 221, subchapter 7 of [Title 18]," "consistent with the principles expressed in section 9371 of this title," but not referencing § 9372). Nothing in § 9372 or § 9456 requires the Board to consider growth on a per-capita basis in each budget analysis and the Board did not err in declining to do so here.

Affirmed.

FOR THE COURT:

_____
Associate Justice

14